# DAVIS *v.* UNITED STATES

No. 72–1454.   Argued February 26, 1974—Decided June 10, 1974

334

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 347. REHNQUIST, J., filed a dissenting opinion, *post*, p. 350.

*Marvin M. Karpatkin* argued the cause for petitioner. With him on the briefs was *Melvin L. Wulf.*

*Edmund W. Kitch* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Petersen, Deputy Solicitor General Frey, Jerome M. Feit,* and *Frederick W. Read III.*

MR. JUSTICE STEWART delivered the opinion of the Court.

This case involves the availability of collateral relief from a federal criminal conviction based upon an intervening change in substantive law. While the question presented is a relatively narrow one, it arises as the result of a rather complicated chain of events.

I

In February 1965, the petitioner, Joseph Anthony Davis, was classified I–A by his draft board and ordered to report for a pre-induction physical examination. Davis failed to appear on the appointed date. He later informed his local board that his failure to report was due to illness. Although the board attempted to arrange

a second date for the pre-induction physical, its attempts to communicate with the petitioner were frustrated by his failure to keep the board apprised of his correct mailing addresses. As a result, the local board's communications to the petitioner were returned to the board stamped "addressee unknown," and Davis again failed to report for the physical. In December 1965, the board sent the petitioner a warning that it was considering declaring him a delinquent because of his failure to report for the second pre-induction physical.[1] This communication was also returned to the board stamped "addressee unknown."

After another unsuccessful attempt to communicate with the petitioner, the local board declared him a delinquent, pursuant to 32 CFR § 1642.4 (a) (1967),[2] both because of his failure to report for the second pre-induction physical and because of his failure to keep the local board informed of his current address.[3]  At the

---

[1] The notice further stated that "[a] delinquent registrant loses his eligibility for deferment and may be placed in a class immediately available for service. He is ordered for induction ahead of other registrants." Pet. for Cert. 21a.

[2] This regulation, which was rescinded shortly after our decision in *Gutknecht* v. *United States,* 396 U. S. 295 (1970), provided in pertinent part:

"(a) Whenever a registrant has failed to perform any duty or duties required of him under the selective service law other than the duty to comply with an Order to Report for Induction . . . or the duty to comply with an Order to Report for Civilian Work . . . , the local board may declare him to be a delinquent."

[3] Title 32 CFR § 1641.4 imposes a duty on every registrant to report for an Armed Forces physical examination at the time and place fixed in the order mailed to the registrant by the board. Title 32 CFR § 1641.1 imposes a duty on every registrant "to keep his local board currently informed in writing of . . . the address where mail will reach him . . . ."

same time the board mailed the petitioner a delinquency notice. Shortly after the delinquency declaration, the board sent the petitioner an order directing him to report for induction into the Armed Forces. Once again, the order was returned to the board stamped "addressee unknown." Several months later, the board sent the petitioner a second order to report for induction. This time the order was mailed to a St. Paul, Minnesota, address that Davis had used when requesting a duplicate draft card. Although there was no indication that Davis did not receive the induction order, he once again failed to report as ordered. This second failure to report for induction resulted in the petitioner's prosecution and conviction under 50 U. S. C. App. § 462 (a).[4]

At the time that the local board issued the second induction order, 32 CFR § 1631.7 (a) (1967) provided that registrants could be ordered to report for induction only after they "[had] been found acceptable for service in the Armed Forces and . . . the local board [had] mailed [them] a Statement of Acceptability . . . at least 21 days before the date fixed for induction." Since, at the time of his induction order, Davis had not yet appeared for a physical examination to determine his acceptability, quite obviously neither one of these requirements was satisfied. The regulation, however, went on to provide that "a registrant classified in

---

[4] Title 50 U. S. C. App. § 462 (a) provides, in pertinent part, that "any person . . . who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title, or rules, regulations, or directions made pursuant to this title . . . shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment." Title 32 CFR § 1641.5 imposes a duty on every registrant "to report for induction at the time and place ordered by the local board."

Class I–A or Class I–A–O who is a delinquent may be selected and ordered to report for induction to fill an induction call notwithstanding the fact that he has not been found acceptable for service in the Armed Forces and has not been mailed a Statement of Acceptability . . . ." The only other registrants similarly excepted from these prerequisites were those who had volunteered for induction. In light of this proviso, the local board evidently concluded that the preconditions to induction stated in § 1631.7 (a) were inapplicable to the petitioner, whom it had earlier declared to be a delinquent, and that it was thus free to issue an induction order to the petitioner.[5]

Davis appealed his conviction to the Court of Appeals for the Ninth Circuit. While that appeal was pending, this Court announced its decision in *Gutknecht* v. *United States,* 396 U. S. 295 (1970). In *Gutknecht* a Selective Service registrant's induction had been accelerated because his local board had declared him a delinquent.[6] When he failed to report for induction as ordered, he was prosecuted and convicted under 50 U. S. C. App. § 462. The delinquent registrant's accelerated induction was ordered in accordance with another portion of 32

---

[5] Both induction orders sent to the petitioner had the word "Delinquent" typed on the face. The local board's "Minutes of Action" also reflect that the petitioner was ordered to report "as Del."

[6] Title 32 CFR § 1631.7 (1967) established an order in which registrants who were eligible would be called for induction. A registrant's place in this order of call was determined by several factors, including age and marital status. If a registrant were declared a delinquent under 32 CFR § 1642.4 (1967), he immediately entered the first priority in the order of call and was ordered to report for induction even ahead of volunteers for induction. In this sense, the registrant's induction was "accelerated" as a result of the local board's delinquency declaration.

CFR § 1631.7 (a) that, like the provision applicable to Davis, called for exceptional treatment for registrants whom a local board had declared delinquent. Local boards were authorized by 32 CFR § 1642.4 to issue a declaration of delinquency "[w]henever a registrant . . . failed to perform any duty or duties required of him under the selective service law," other than to report as ordered for induction or for civilian work. Both Davis and Gutknecht were declared delinquent on the authority of § 1642.4.[7] In *Gutknecht,* the Court held that the Selective Service regulations that accelerated the induction of delinquent registrants by shifting them to the first priority in the order of call were punitive in nature and, as such, were without legislative sanction.[8] Accordingly, the Court concluded that the registrant could not be prosecuted for failure to comply with an induction order issued pursuant to these regulations.

After *Gutknecht,* the Court of Appeals remanded the petitioner's case to the District Court "without limitation of scope but especially for consideration . . . in the light of the intervening decision of *Gutknecht* v. *United States*." 432 F. 2d 1009, 1010 (1970). On remand,

---

[7] Gutknecht had been declared a delinquent for failing to have his registration certificate and current classification notice in his possession at all times, as required by 32 CFR §§ 1617.1 and 1623.5, respectively.

[8] In this regard, the Court said:

"The power under the regulations to declare a registrant 'delinquent' has no statutory standard or even guidelines. The power is exercised entirely at the discretion of the local board. It is a broad, roving authority, a type of administrative absolutism not congenial to our law-making traditions. . . . We search the Act in vain for any clues that Congress desired the Act to have punitive sanctions apart from the criminal prosecutions specifically authorized . . . . If federal or state laws are violated by registrants, they can be prosecuted. If induction is to be substituted for these prosecutions, a vast rewriting of the Act is needed." 396 U. S., at 306–307.

the District Court, after conducting a hearing, concluded that the petitioner's induction had not been accelerated because of his delinquency status and that *Gutknecht* therefore did not affect his conviction.[9]   On appeal, the Court of Appeals affirmed.   447 F. 2d 1376.

While Davis' subsequent petition for certiorari was pending in this Court, the Court of Appeals for the Ninth Circuit decided *United States* v. *Fox,* 454 F. 2d 593.   The circumstances leading to Fox's induction order were virtually identical to those in the petitioner's case.   Like Davis, "Fox was declared delinquent by his Selective Service Board . . . for his failure to appear for pre-induction physical examinations as ordered . . . ."   *Ibid.* Prior to receiving his induction order, "Fox . . . was never found to be 'acceptable for service' and he was [not] mailed a Statement of Acceptability . . . at least 21 days before his induction date . . . ."   "[T]hus the only authority the Local Board had for its order to Fox to report for induction was the provision of § 1631.7. (b)[10] for delinquents to be called without a previous finding of acceptability or the mailing of a Statement of Acceptability 21 days before induction."   *Id.,* at 595.

---

[9] At the hearing in the District Court, the executive secretary of the local board testified that the petitioner would have been inducted earlier if he had not failed to appear for the physical.   In corroboration, the Government introduced the local board's "delivery lists" showing the induction dates of other registrants at the local board.   The District Court found that if the petitioner had complied with the local board's procedures and "[h]ad . . . not been declared a Delinquent, he would have been ordered to report for induction on or before November 15, 1966," which would have been nearly eight months before he finally failed to report (July 11, 1967).

[10] Between the dates of the induction orders of Davis and Fox, the provisions of 32 CFR § 1631.7 (a) (1967) were incorporated into 32 CFR § 1631.7 (b) (1969).

This was the same regulation on which the board's induction order to Davis had been predicated.

At Fox's post-*Gutknecht* trial for failure to report for induction, "the government offered evidence . . . to show that Fox's induction order was not accelerated by the declaration of delinquency." "The trial judge found no acceleration and convicted." *Id.*, at 593–594. The Court of Appeals reversed Fox's conviction on the authority of *Gutknecht*. The court held that "Fox's induction was accelerated by the declaration of delinquency as a matter of law [because] [w]ithout the declaration, the Board could not have ordered him to report for induction." *Id.*, at 594. Thus, the court concluded "that the [induction] order . . . was illegal and created no duty on Fox's part to report for induction." *Id.*, at 595.

In opposing Davis' petition for certiorari, the Solicitor General conceded that "the holdings in *Fox* and in [*Davis*] are inconsistent," but nevertheless urged the Court to deny certiorari in that "the conflict is an intra-circuit one . . . [to] be resolved by the Ninth Circuit itself . . . ." Supplemental Memorandum for the United States in Opposition 2 (No. 71–661, O. T. 1971). We denied Davis' petition for certiorari. 405 U. S. 933.

After an unsuccessful attempt to secure a rehearing in the Court of Appeals, Davis was remitted to federal custody to commence serving his three-year sentence. He then instituted the present collateral proceeding under 28 U. S. C. § 2255, which permits "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . [to] move the court which imposed the sentence to vacate, set aside or correct the sentence." In his § 2255 motion,

Davis asserted that the Court of Appeals for the Ninth Circuit had in the *Fox* case effected a change in the law of that Circuit after the affirmance of his conviction, and that its holding in *Fox* required his conviction to be set aside. The District Court summarily denied the petitioner's motion.[11]  On appeal, the Court of Appeals affirmed without considering the merits of the petitioner's claim on the ground that "[t]he decision on the direct appeal is the law of the case," and that therefore any "new law, or change in law" resulting from its decision in *United States* v. *Fox* would "not [be] applied in this circuit under circumstances such as here presented." 472 F. 2d 596.  Because the case presents a seemingly important question concerning the extent to which relief under 28 U. S. C. § 2255 is available by reason of an intervening change in law, we granted certiorari. 414 U. S. 999.

## II

The sole issue before the Court in the present posture of this case is the propriety of the Court of Appeals' judgment that a change in the law of that Circuit after the petitioner's conviction may not be successfully asserted by him in a § 2255 proceeding.[12]  Thus, our inquiry is confined to the availability of a § 2255 proceeding for

---

[11] At the time of his § 2255 motion in the District Court, Davis also moved under Fed. Rule Crim. Proc. 35 for reduction or modification of his sentence.  This motion was taken under advisement by the District Court and was thereafter granted in part.  As a result, the petitioner was released from incarceration after having served four months of his three-year sentence, and he was placed on probation for the remainder of the original term.

[12] In the absence of a decision by the Court of Appeals on the merits of the petitioner's contentions, this case is not an appropriate vehicle to consider whether the *Gutknecht* decision has retroactive application or whether the *Fox* case was correctly decided by the Court of Appeals.

the resolution of Davis' claim to relief from his conviction.

Because the petitioner had unsuccessfully litigated the *Gutknecht* issue on direct review, the Court of Appeals held that its earlier affirmance was "the law of the case" and precluded the petitioner from asserting on collateral attack his claim that its *Fox* decision had subsequently changed the law of the Ninth Circuit on that issue. In this Court, the Solicitor General's brief concedes that the opinion of the Court of Appeals in this regard "is not consonant with this Court's holding in *Sanders* v. *United States,* 373 U. S. 1." [13] In *Sanders,* the Court held, *inter alia,* that even though the legal issue raised in a § 2255 motion "was determined against [the applicant] on the merits on a prior application," "the applicant may [nevertheless] be entitled to a new hearing upon showing an intervening change in the law . . . ." *Sanders* v. *United States,* 373 U. S. 1, 17. The same rule applies when the prior determination was made on direct appeal from the applicant's conviction, instead of in an earlier § 2255 proceeding, "if new law has been made . . . since the trial and appeal." *Kaufman* v. *United States,* 394 U. S. 217, 230 (1969). Thus, the Court of Appeals erred in holding that "the law of the case," as determined in the earlier appeal from the petitioner's conviction, precluded him from securing relief under § 2255 on the basis of an intervening change in law.

Nevertheless, the Solicitor General contends that we should affirm the judgment of the Court of Appeals because the petitioner's claim is not "of constitutional dimension" (Brief for United States 34) and thus is not cognizable in a § 2255 collateral proceeding. At the outset, we note that the Government's position finds scant support in the text of § 2255, which permits a federal prisoner to assert a claim that his confinement is "in

[13] Brief for United States 25 n. 11.

violation of the Constitution *or laws* of the United States." (Emphasis added.)

It is argued forcefully in a dissenting opinion today that this language, which appears in the first paragraph of § 2255, is somehow qualified by the third paragraph of the statute, which provides:

> "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."

The dissent of MR. JUSTICE REHNQUIST rejects any suggestion that the language concerning "sentence[s] . . . otherwise open to collateral attack" can encompass a claim that a confinement under that sentence violates the "laws of the United States," contending that this would reduce the remaining language regarding "a denial or infringement of constitutional rights" to surplusage. Indeed, the nub of the dissent is that § 2255 "does not speak of an illegal *'confinement'* . . . or even of an illegal *conviction,* but rather of illegal *sentences." Post,* at 356. (Emphasis in original.) Although this microscopic analysis of § 2255 surely shows that the statutory language is somewhat lacking in precision, the resulting shadow that the dissenting opinion would cast over the statute totally disappears in the light of its legislative history.

That history makes clear that § 2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus. As the Court pointed out in *United States* v. *Hayman,* 342 U. S. 205, 219 (1952), the "history

of Section 2255 shows that it was passed at the instance
of the Judicial Conference to meet practical difficulties
that had arisen in administering the habeas corpus juris-
diction of the federal courts. Nowhere in the history of
Section 2255 do we find any purpose to impinge upon pris-
oners' rights of collateral attack upon their convictions.
On the contrary, the sole purpose was to minimize the
difficulties encountered in habeas corpus hearings by af-
fording the same rights in another and more convenient
forum." Thus, there can be no doubt that the grounds
for relief under § 2255 are equivalent to those encom-
passed by § 2254, the general federal habeas corpus stat-
ute, under which relief is available on the ground that
"[a person] is in custody in violation of the Constitution
*or laws* or treaties of the United States." (Emphasis
added.) Furthermore, although the dissent of MR. JUS-
TICE REHNQUIST derides the view that the words "other-
wise open to collateral attack" are intended to be "a
catch-all phrase," *post,* at 358, the legislative history fully
supports that view. In recommending to Congress what
eventually became § 2255, the Judicial Conference Com-
mittee on Habeas Corpus Procedure stated that "[t]he
motion remedy broadly covers all situations where the
sentence is 'open to collateral attack.' As a remedy, it
is intended to be as broad as habeas corpus." [14]

No microscopic reading of § 2255 can escape either the
clear and simple language of § 2254 authorizing habeas
corpus relief "on the ground that [the prisoner] is in
custody in violation of the . . . laws . . . of the United
States" or the unambiguous legislative history showing
that § 2255 was intended to mirror § 2254 in operative
effect. Thus, we cannot agree that the third paragraph
of § 2255 was in any fashion designed to mark a retreat
from the clear statement that § 2255 encompasses a pris-

---

[14] *United States* v. *Hayman,* 342 U. S. 205, 217 (1952).

oner's claim of "the right to be released upon the ground that the sentence was imposed in violation of the Constitution *or laws* of the United States." Accordingly, we conclude that the text of the statute cannot sustain the Government's position that only claims "of constitutional dimension" are cognizable under § 2255.

Moreover, there is no support in the prior holdings of this Court for the proposition that a claim is not cognizable under § 2255 merely because it is grounded in the "laws of the United States" rather than the Constitution. It is true, of course, that in *Sunal* v. *Large*, 332 U. S. 174 (1947), the Court held that the nonconstitutional claim in that case could not be asserted to set aside a conviction on collateral attack. But *Sunal* was merely an example of "the general rule . . . that the writ of *habeas corpus* will not be allowed to do service for an appeal." *Id.*, at 178. "Appeals could have been taken in these cases, but they were not." *Id.*, at 177. The Court was careful to point out that "if Sunal and Kulick had pursued the appellate course and failed, their cases would be quite different. But since they chose not to pursue the remedy which they had, we do not think they should now be allowed to justify their failure by saying they deemed any appeal futile." *Id.*, at 181. Moreover, "[t]he case [was] not one where the law was changed after the time for appeal had expired." *Ibid.* Thus, *Sunal* cannot be read to stand for the broad proposition that nonconstitutional claims can never be asserted in collateral attacks upon criminal convictions.[15] Rather,

---

[15] Although *Sunal* held that a federal prisoner could not assert a nonconstitutional claim on collateral attack if he had not raised it on appeal, the Court there recognized that this rule would not bar the assertion of *constitutional* claims in collateral proceedings even if the applicant had failed to pursue them on appeal. 332 U. S. 174, 178–179, 182. Cf. *Kaufman* v. *United States*, 394 U. S. 217, 223 (1969).

the implication would seem to be that, absent the particular considerations regarded as dispositive in that case, the fact that a contention is grounded not in the Constitution, but in the "laws of the United States" would not preclude its assertion in a § 2255 proceeding.

This is not to say, however, that every asserted error of law can be raised on a § 2255 motion. In *Hill* v. *United States*, 368 U. S. 424, 429 (1962), for example, we held that "collateral relief is not available when all that is shown is a failure to comply with the formal requirements" of a rule of criminal procedure in the absence of any indication that the defendant was prejudiced by the asserted technical error. We suggested that the appropriate inquiry was whether the claimed error of law was "a fundamental defect which inherently results in a complete miscarriage of justice," and whether "[i]t . . . present[s] exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent." *Id.,* at 428 (internal quotation marks omitted). The Court did not suggest that any line could be drawn on the basis of whether the claim had its source in the Constitution or in the "laws of the United States."

In this case, the petitioner's contention is that the decision in *Gutknecht* v. *United States,* as interpreted and applied by the Court of Appeals for the Ninth Circuit in the *Fox* case after his conviction was affirmed, establishes that his induction order was invalid under the Selective Service Act and that he could not be lawfully convicted for failure to comply with that order. If this contention is well taken, then Davis' conviction and punishment are for an act that the law does not make criminal. There can be no room for doubt that such a circumstance "inherently results in a complete miscarriage of justice" and "present[s] exceptional cir-

cumstances" that justify collateral relief under § 2255. Therefore, although we express no view on the merits of the petitioner's claim, we hold that the issue he raises is cognizable in a § 2255 proceeding.

The judgment of the Court of Appeals is accordingly reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL, concurring in part and dissenting in part.

I agree with the Court's holding that review under 28 U. S. C. § 2255 is available to petitioner, due to the intervening change in the law of the Circuit. But I would dispose of the case finally, not remand it.

Petitioner's case turns on whether his conviction for refusing induction has been invalidated by *Gutknecht* v. *United States,* 396 U. S. 295 (1970). Both parties have raised, briefed and argued this issue, and it is properly before us. We should, in the interest of judicial economy if for no other reason, decide the *Gutknecht* issue and bring to an end this lengthy litigation, rather than remand it to the Court of Appeals for that court's fourth round of consideration.

In my view, petitioner's reliance upon *Gutknecht* is misplaced. Petitioner reads *Gutknecht* as invalidating the former delinquency regulations of the Selective Service System in every possible application.[1] He espouses a *per se* rule under which any induction order that derived from an application of those delinquency regulations is illegal. *Gutknecht* does not have such a broad sweep.

---

[1] *Gutknecht* concerned primarily 32 CFR § 1642.13 (1969), now superseded, which assigned first priority in the order of induction to delinquents. That regulation is not at issue here.

In *Gutknecht,* the registrant was declared a delinquent for failing to retain his registration and classification papers in his possession at all times. He had surrendered these papers in an act of protest against the Vietnam conflict. As a consequence of the delinquency declaration, he was rushed—indeed it might be said railroaded—to induction. The entire process lasted less than two months, and Gutknecht was issued an induction order on the day after Christmas, only six days after he had been declared a delinquent. He was deprived of his standing in the order of call and was truly "accelerated" in that he was ordered to induction prior to the date on which he would have been called if treated in the normal manner. Gutknecht, in essence, was caught up in the tide of punitive actions by the Selective Service System in the late 1960's against those who were thought to be evading military service because of opposition to the Vietnam conflict.

The Court's opinion in *Gutknecht* repeatedly refers to this deliberately punitive attitude of the Service and its use of the then prevailing delinquency regulations as a means, short of criminal prosecution, for dealing with such persons. See, *e. g.,* 396 U. S., at 306–308. But I do not read *Gutknecht* as overturning the former delinquency regulations in all circumstances, or as depriving boards of a reasonable and effective alternative procedure for dealing with recalcitrant registrants who plainly were seeking to avoid military service. If the stated rationale of the holding in *Gutknecht* is accepted, that case invalidated those regulations only insofar as they were applied punitively to advance the date of a registrant's induction or to deprive him of procedural rights that he had not waived. See *United States* v. *Dobie,* 444 F. 2d 417 (CA4 1971). The reasons relied upon by the Court in *Gutknecht* and in the concurring opinion

of MR. JUSTICE STEWART, 396 U. S., at 314, are incompatible with a *per se* rule proscribing all board authority to order an evasive registrant to report for induction. Thus, in my view *United States* v. *Fox,* 454 F. 2d 593 (CA9 1971), on which Davis relies, was incorrectly decided.

In the instant case it is undisputed that Davis was not, as a result of being declared delinquent, ordered to report for induction at a point in time prior to the normal order of his call. Indeed, due to the board's patient efforts to deal with Davis' repeated attempts to obstruct the induction process, Davis was ordered to report for induction some seven months later than would have been the case if the process had been allowed to function normally. There is no hint of vindictiveness or of an attempt to punish Davis.

The only impact on Davis of being declared delinquent, other than a *delay* in the issuance of an order to report for induction, was that the declaration of delinquency permitted the board under then prevailing regulations to issue an induction order in the absence of a pre-induction physical examination and of the resulting form letter notifying Davis of his acceptability for service.[2] Davis attempts to portray these preconditions

---

[2] Under 32 CFR § 1631.7 (1967), which has been withdrawn, the board could issue induction orders to those classified I–A or I–A–O who had been (i) found acceptable for service and (ii) mailed a Statement of Acceptability at least 21 days before the date fixed for induction, provided:

"That a registrant classified in Class I–A or Class I–A–O who is a delinquent may be selected and ordered to report for induction . . . notwithstanding the fact that he has not been found acceptable for service . . . and has not been mailed a Statement of Acceptability . . . ."

Davis received his induction notice under this regulation. Davis maintains that *Gutknecht* invalidated the above proviso clause, thus depriving the board of the power to induct him in the absence of

on induction as significant procedural rights of which he was unfairly deprived by the board. The argument is frivolous. Davis frustrated every effort of the board over a period of more than two years to accord him the right to a physical examination. Thus he waived the procedural rights on which he now seeks to rely. Moreover, he would have received such an examination in any event if he had reported for induction. And the form notifying a registrant of acceptability for service is hardly a matter of major moment, particularly to one who had long been on notice of the pendency of an induction order.

On the record in this case, no one could seriously contend that Davis was the victim of punitive action or that he was not treated with tolerance and forbearance. In my view, the Court in *Gutknecht* could hardly have intended to invalidate an induction order in such circumstances.

I would affirm the judgment.

MR. JUSTICE REHNQUIST, dissenting.

The Court today holds, with a minimum of discussion, that petitioner, in a proceeding under 28 U. S. C. § 2255, may raise his claim that his induction into the Armed Forces was accelerated contrary to the principles of *Gutknecht* v. *United States,* 396 U. S. 295 (1970). The Court reaches this result despite the fact that a United States District Court and the Court of Appeals for the Ninth Circuit previously considered this contention in light of *Gutknecht* and concluded that petitioner's in-

---

a finding of acceptability (*i. e.,* a pre-induction physical) and a Statement of Acceptability. But, as noted, *Gutknecht* dealt with punitive treatment of delinquents, not all treatment of such registrants. Moreover, the above regulation was not at issue in *Gutknecht.*

duction had not in fact been accelerated. As a justification for the decision this Court suggests that a § 2255 motion is both permissible and appropriate because a panel of the Court of Appeals for the Ninth Circuit has rendered a subsequent decision which adopts a new legal test for determining whether acceleration has occurred and which, if applied to petitioner, would probably change the outcome of his case. Since I believe the Court's decision is justified neither by the language of § 2255 itself nor by any prior case decided by this Court, and since I believe the potential consequences of the decision are harmful to the administration of justice, I dissent.

## I

The Court's conclusion, discussed *infra,* that claims such as petitioner's can be raised on a § 2255 motion, is actually unnecessary for the disposition of this case. The decisions of the District Court and the Court of Appeals rested entirely on application of a "law of the case" theory, a position that the Government now disavows and that the Court disposes of in a single paragraph. The petitioner in his petition for certiorari and in his brief on the merits principally addressed that issue and his sole rebuttal of the Government's contention that nonconstitutional attacks on judgments of conviction are not cognizable in § 2255 proceedings is contained in his reply brief where he devotes one paragraph to arguing that his claim *is constitutional.* Thus the Court reaches out to decide a highly important issue without the benefit of lower court attention to the question, without full briefing and, in my view, without full examination of the issues involved. It would seem preferable to remand this case, as the Court does anyway, without deciding this issue, allowing further consideration of the question below and leaving our venture into this area for a more appropriate

occasion. Since the Court declines to do so, however, I will also address the broader question to which the Court proceeds.

## II

The facts of this case are set out in detail in the Court's opinion. I review them here briefly only to emphasize the extent of both administrative and judicial consideration which petitioner has received. A mere recounting of the facts dispels the notion that there are any equities whatever in support of petitioner's claim for relief.

Petitioner's difficulties with the Selective Service System began in February of 1965 when he was classified I–A by his local draft board. At that time he was ordered to report for a pre-induction physical examination, but did not appear on the specified date. The board then attempted to schedule another physical but was frustrated by petitioner's failure to advise the board of his whereabouts. At this point the board warned petitioner that he was in danger of being declared a delinquent, but this warning was also returned with the notation "addressee unknown."

The board made one more unsuccessful attempt to communicate with petitioner and then declared him a delinquent according to the regulations then in effect.[1] After a brief interval the board then mailed petitioner, not a third notice to report for a physical examination, but rather a notice to report for induction. This order having been returned stamped "addressee unknown," the board followed up by sending petitioner a second notice to report for induction which he apparently received. He did not report, however, and was then prosecuted for this refusal.

---

[1] The particular regulation relied upon by the board was 32 CFR § 1642.4 (a) (1967), which was rescinded after the Court's decision in *Gutknecht* v. *United States*, 396 U. S. 295 (1970).

All parties to this case concede that Selective Service registrants who are not declared delinquents are not mailed orders of induction before they have taken a physical examination. Without the delinquency classification, which allowed the board to issue an induction order without having given a physical examination, the board would have been faced with one of two alternatives. It could have prosecuted the petitioner for failure to take the physical examination or, alternatively, it could have continued the obviously futile mailing of additional notices concerning the physical. The delinquency procedure enabled the board to bypass those two undesirable options, and, in effect, provided for a temporary waiver of the examination until the time stated in the induction order. It should be noted that this procedure does not allow the board to *induct* anyone without a physical examination; rather it simply allows the board to *call* persons for induction prior to the time an examination is given.[2]

Having been convicted in the District Court, petitioner took a direct appeal to the Court of Appeals for the Ninth Circuit. While the appeal was pending in that court, however, this Court decided *Gutknecht,* and the Court of Appeals then remanded the case to the District Court for further consideration in light of our decision. On remand, the District Court decided that *Gutknecht* did not apply because petitioner's induction had not in fact been accelerated.[3] The court also found that "[d]efendant's substantial rights were not prejudiced by the Local Board's ordering him to report for induction without first giving him a physical examination and sending

---

[2] The District Court specifically found that petitioner "would have received a complete physical examination prior to induction had he reported on July 11, 1967, as ordered." Pet. for Cert. 10a.

[3] *Id.,* at 9a.

him a Notice of Acceptability," [4] because "[t]he failure to give such an examination and such Notice of Acceptability were [sic] caused by defendant's own failure to report for physical examination on October 8, 1965, as ordered." [5] The Court of Appeals agreed that *Gutknecht* did not control this case and affirmed. [6] We denied certiorari. [7]

Although one might have supposed the proceedings to be closed at this point, our denial of certiorari marked only the end of phase one. For petitioner, having failed on his direct attack, then sought relief under 28 U. S. C. § 2255, presenting the same claims of acceleration which had previously been rejected. The principal basis for petitioner's motion was that the law of the Ninth Circuit, unfavorable to him at the time of his conviction and appeal, had subsequently been changed in *United States* v. *Fox,* 454 F. 2d 593 (1971). The District Court denied relief without comment, and the Court of Appeals again affirmed. [8] Stating that "[t]he decision on the direct appeal is the law of the case," [9] that court also noted specifically "that *Fox* does not even suggest overruling *Davis,*" [10] and further that "the new law, or change in law, rule is not applied in this circuit under circumstances such as here presented. Odom v. United States, *supra.*" [11] Again one would suppose that the dispute had reached its end, but this Court today decrees otherwise, remanding it for yet more consideration by the courts below.

[4] *Ibid.*
[5] *Id.,* at 9a–10a.
[6] 447 F. 2d 1376.
[7] 405 U. S. 933.
[8] 472 F. 2d 596.
[9] *Ibid.*
[10] *Ibid.*
[11] *Ibid.*

## III

For reasons that I frankly do not understand, the Court seems to believe that the question of whether claims such as petitioner's may be raised in a motion under § 2255 is either largely settled by § 2255 itself and by earlier decisions of this Court or, perhaps, is too inconsequential to require extended treatment. Neither premise is sound. Both the language of § 2255 and the case law of this Court suggest that the issue is very much in doubt, and the potential consequences of the decision suggest that the matter calls for serious and careful consideration.

In deciding whether claims of this type may be raised in a § 2255 motion, the logical starting place is the statute itself. The Court's opinion, however, gives the statute only a passing nod, apparently believing that ambiguity is best resolved by ignoring the source from which it arises. I believe the statute and the Court's treatment of it require a closer look.

The Court begins its discussion of the statute by stating: "At the outset, we note that the Government's position finds scant support in the text of § 2255, which permits a federal prisoner to assert a claim that his confinement is 'in violation of the Constitution *or laws* of the United States.' " [12] (Emphasis in Court's opinion.) The language quoted by the Court is taken from the first paragraph of § 2255 which reads:

> "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the

---

[12] *Ante,* at 342–343.

356

sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

That paragraph, however, does not speak of an illegal *"confinement,"* as suggested by the Court, or even of an illegal *conviction,* but rather of illegal *sentences.* Furthermore, the paragraph is concerned only with motions for relief, not with the Court's power to grant relief. The power to grant relief is instead governed by the more specific provisions of paragraph three of the statute.

The language of paragraph three differs quite strikingly from the language quoted above. After providing for notice and a hearing in appropriate cases, the paragraph continues:

"If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or thât there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."

This language certainly makes less clear the intended scope of paragraph one, since, contrary to the emphasis on "sentence" in the earlier paragraph, the provisions of paragraph three mention "sentence" which may be set aside only twice, and then in connection with those "not authorized by law or otherwise open to collateral attack . . . ."[13] More importantly, the paragraph makes

---

[13] The statute seems, at times, to use the terms "sentence" and "judgment" interchangeably, for paragraph three allows relief from

no mention of judgments rendered in violation of the *laws* of the United States. Rather the paragraph permits relief only where "there has been such a denial or infringement of the *constitutional* rights of the prisoner as to render the judgment vulnerable to collateral attack . . . ." (Emphasis added.) Thus a district court may grant relief under this section only where (1) the judgment rendered was without jurisdiction; (2) the sentence was not authorized by law or is otherwise open to collateral attack; or (3) there has been such a denial of constitutional rights as to render the judgment vulnerable to collateral attack. Petitioner's case does not even arguably meet any one of these tests: the District Court clearly had jurisdiction to render a judgment of conviction; the sentence was concededly within the limits authorized by law and not otherwise vulnerable; and the Court apparently accepts the fact that petitioner has not presented a constitutional claim against the judgment. Nothing in the more generalized reference to "laws of the United States" in the first paragraph of § 2255, therefore, can redeem petitioner's complete failure to bring himself within the operative language of the third paragraph.[14]

---

judgments in specified instances while paragraph one would seem to allow attacks only on sentences. But the fact that no distinction is made between the terms in paragraph one does not mean that their contrasting use in paragraph three can automatically be deemed without significance. The Court should attempt to reach a reasonable interpretation based upon the particular context of the statute and the historical background of collateral relief, rather than simply abandoning the statute to study its legislative history. See, *e. g.,* *United States* v. *Sobell,* 314 F. 2d 314 (CA2), cert. denied, 374 U. S. 857 (1963).

[14] It might be argued, of course, that the first paragraph of § 2255 was for some reason designed to permit the filing of motions for relief even in some cases where relief could not be granted under paragraph three. But the Court offers no reason, and I can think of none, why Congress would encourage such a futile exercise. What

The Court, however, strongly suggests that its opinion could rest upon the provision of paragraph three providing relief for "sentence[s] ... otherwise open to collateral attack." This suggestion only compounds the confusion. To begin with, it seems odd that the Court chooses to bypass the language of that same sentence dealing with sentences (rather than judgments) "not authorized by law" since that language far more closely parallels the language from the first paragraph cited by the Court. But, in any event, reading words "otherwise open to collateral attack" as simply a catch-all phrase, including any recognizable ground for upsetting convictions on direct appeal makes it difficult to see why Congress then bothered to include the separate provision allowing relief when "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack ...." The Court could not reasonably argue that this provision is intended to give additional protection to constitutional rights because the Court purports to find no distinction in the statute between constitutional and nonconstitutional attacks on judgments of conviction.

But assuming for the moment that the Court's approach is correct, I find a second obstacle to this decision in the definition, or lack of definition, of the word "laws." For though the Court seems to accept that petitioner has stated a recognizable claim that his sentence was somehow imposed in violation of the laws of the United States, the Court only briefly mentions what law the sentence is thought to be in violation of. Certainly petitioner cannot contend that his sentence under 50 U. S. C. App. § 462 (a) for refusing to report for induction is in violation

the Court has done is simply to read most of paragraph three out of the statute, apparently assuming that its more specific provisions have no function in a proper interpretation of § 2255.

of *that* section. Nor does he point to any other statutory provision which prohibits his incarceration for that offense. Therefore the basis for the claim, as the Court seems to believe, lies somewhere in the holdings of this Court in *Gutknecht* and of the Court of Appeals for the Ninth Circuit in *Fox*. The inclusion of either of these decisions in the category of "laws of the United States" merits some additional attention.

The term "laws of the United States" was included in § 2255 presumably to continue its traditional place in federal habeas corpus statutes.[15] The Habeas Corpus Act of 1867, c. 28, 14 Stat. 385, gave federal courts the power to grant writs of *habeas corpus* in all cases where any person may be restrained of his or her liberty "in violation of the constitution, or of any treaty or law of the United States . . . ." This language was carried forward in Rev. Stat. § 753 and now in 28 U. S. C. §§ 2241 (c)(3) and 2254 where the word "law" has been changed to "laws." The same phrasing has now been incorporated into § 2255. But the term's longevity has not brought with it a corresponding judicial elucidation. Like many other issues in the field of habeas corpus, the question seems to have been left for decision on a case-by-case basis.

Certainly a creditable argument could be made that the term "laws" applies only to federal statutes, not to individual decisions of the federal courts. In 1842, for example, only 25 years before the Habeas Corpus Act

---

[15] Section 2255 was enacted to provide the same relief available under the federal habeas corpus statute without the logistical problems encountered in the latter remedy. *United States* v. *Hayman,* 342 U. S. 205 (1952). The Court makes much of this fact in its opinion but then drops the issue without examining what constituted a "law" for purposes of habeas corpus or what the scope of habeas corpus relief has proved to be under the decisions of this Court.

was passed, this Court stated: "In the ordinary use of language it will hardly be contended that the decisions of Courts constitute laws." *Swift* v. *Tyson,* 16 Pet. 1, 18.[16]   But even if some allowance for judicial lawmaking is made, the question in this case is not settled. For, if the law be *Gutknecht,* then the Court's "new law" argument immediately disappears.   Petitioner had a full opportunity to argue the applicability of *Gutknecht* on remand from his first appeal, and both the District Court and Court of Appeals found that it was not controlling.   Since that time no decision of this Court has modified *Gutknecht* in any way which would now bring petitioner within its scope.   Thus the real focus of petitioner's argument must be that *Fox* is the governing law.   But in that regard, I cannot see why a decision by a single panel of the Court of Appeals for the Ninth Circuit should be considered a "law" of the United States.   In fact the Court of Appeals itself stated that its decision in *Fox* had not overruled *Davis,* pointing out that an en banc decision of the Court of Appeals would be necessary for such a result.   Thus the Court today categorizes as a "law of the United States" a decision which is still open to question within the Court of Appeals' own jurisdiction.

---

[16] The Court in *Swift* v. *Tyson, supra,* was considering a section of the Judiciary Act of 1789, § 34, 1 Stat. 92, which stated, in part: "[T]he laws of the several states, except where the constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply."   The Court, in explaining its doubt that court decisions constituted "laws" observed: "They are, at most, only evidence of what the laws are, and not of themselves laws.   They are often re-examined, reversed, and qualified by the Courts themselves, whenever they are found to be either defective, or ill-founded, or otherwise incorrect."   16 Pet., at 18.

The Court gives no indication of where this loose process of definition will end. It would certainly be surprising if a decision of the Court of Appeals for the Fourth Circuit, for example, were sufficient to give prisoners in the Ninth Circuit grounds for a § 2255 motion, but it is not clear to me why a decision of the Fourth Circuit is any less a law of the United States than a decision of the Ninth Circuit. Concededly, it need not be considered binding on the Ninth Circuit, but that is not the concern under § 2255. Nor is it obvious to me what the Court would require a court of appeals to do when intracircuit conflicts arise. The decision today would seem to compel the Court to give a defendant already convicted according to one statutory interpretation the benefit of any more liberal interpretation which might emerge. This erratic process of interpretation finds no warrant in § 2255.

## IV

The Court's lack of attention to the statutory language in this case is more than matched by the sparsity of the case law it cites. Although the Court seems to accept without question that both relief under § 2255 and habeas corpus relief have long been available to prisoners making nonconstitutional attacks on judgments of conviction, the Court cites not a single case from this Court that so holds.[17] Certainly neither *Sanders* v. *United States*, 373 U. S. 1 (1963), nor *Kaufman* v. *United States*, 394 U. S. 217 (1969), the two most significant § 2255 decisions in recent years, is controlling on the important issue pre-

---

[17] The Court, in fact, avoids the necessity for a closer look at the statutory language of § 2255 by turning instead to the provisions of the federal habeas statute as a guide. This reliance makes all the more curious the fact that the Court does not support its view of the scope of federal habeas by any convincing citation of authority.

sented here, for both decisions involved completely different factual situations and considerations.[18]  *Hill* v. *United States*, 368 U. S. 424 (1962), a third important case under § 2255 and one cited by the Court in its opinion, would seem to cut against the Court's position. In *Hill* the Court held that a failure to follow the requirements of Fed. Rule Crim. Proc. 32 (a), a rule promulgated under the auspices of a federal statute, was not the type of error which could be raised on a § 2255 motion. The Court stated:

> "The failure of a trial court to ask a defendant represented by an attorney whether he has anything

---

[18] The *Sanders* Court's statement of the issue before it clearly demonstrates how different that case was from the one now under consideration.  In *Sanders* the Court said: "We consider here the standards which should guide a federal court in deciding whether to grant a hearing on a motion of a federal prisoner under 28 U. S. C. § 2255."  373 U. S., at 2.  That issue arises, not under paragraph one of § 2255, setting forth the claims which a prisoner might make, or under that part of paragraph three setting forth the grounds on which relief might be granted, but under the language found earlier in paragraph three dealing with when a hearing must be held. Thus, the Court in *Sanders* was faced with the question, not of whether a particular type of claim is cognizable *at all* in a § 2255 proceeding, but simply whether a hearing is required on a claim concededly within the reach of that section.

The petitioner in *Kaufman*, in contrast to the petitioner here, sought relief on the ground that he had been subjected to an unconstitutional search and seizure.  The Court's recognition of the constitutional tenor of his claim is evident throughout the opinion.  For example, the Court clearly stated that "the availability of collateral remedies is necessary to insure the integrity of proceedings at and before trial *where constitutional rights are at stake*," 394 U. S., at 225 (emphasis added), and that "[t]he provision of federal collateral remedies rests more fundamentally upon a recognition that adequate protection of *constitutional rights* relating to the criminal trial process requires the continuing availability of a mechanism for relief." *Id.*, at 226 (emphasis added).

to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus. *It is an error which is neither jurisdictional nor constitutional.* It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure. It does not present 'exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.' " 368 U. S., at 428. (Emphasis added; citations omitted.)

The only other case mentioned by the Court which might be relevant to this issue is *Sunal* v. *Large,* 332 U. S. 174 (1947), a case like *Hill* in which this Court *denied* relief for a claim with no constitutional foundation. The Court today suggests, by stress on a negative pregnant, that the decision to deny habeas corpus relief in that case was grounded solely on the petitioner's failure to raise his claim on direct appeal and that if the issue had been properly raised, the Court would have reached a different conclusion. It is true, of course, that collateral relief is not to be employed as a substitute for an appeal, and *Sunal* is a leading case for that proposition. But a reading of *Sunal* which recognizes only the effect of failure to appeal is unnecessarily grudging. The Court in *Hill,* for example, although faced with a situation in which the noncompliance with Rule 32 (a) was not raised on appeal, did not imply that the error could have been raised in § 2255 proceedings if an appeal had been taken. Rather the Court stated flatly: "We hold that the failure to follow the formal requirements of Rule 32 (a) is not of itself an error that can be raised by collateral attack . . . ." 368 U. S., at 426.

Although the scope of relief in a habeas corpus proceeding remains largely undefined, probably out of concern

that definition would introduce unwanted limitation, the judicial expansion of the federal courts' habeas power had not previously reached the type of claim asserted here.    Certainly Mr. Justice Frankfurter's catalogue in *Sunal, supra,* at 185–186 (dissenting opinion), makes no mention of such grounds.    And there is no dearth of authority to the effect that federal habeas corpus is not available merely to correct errors of law.[19]    Many decisions of lower federal courts have at least implicitly limited collateral relief to claims of constitutional stature.[20]

The lack of foundation from which the Court now proceeds to fashion a new, expansive collateral-relief doctrine unfortunately suggests that the Court is prepared to extend or retract relief on the basis of whether a majority of the Court believes that a particular set of factual circumstances is "exceptional" or that a particular litigant has raised an appealing point.    Thus, the petitioner in *Hill* is barred from raising his claim at all in a § 2255 proceeding because failure to comply with an explicit federal rule is "not of itself an error of the character or magnitude cognizable under a writ of habeas corpus."    The petitioner in *Sunal* is also barred, despite a "far more compelling" claim than the one raised in *Hill,* see 368 U. S., at 428, apparently because he did not receive a previous rejection of his claim on direct appeal.    But petitioner in this case succeeds.    According to the Court, this case is different, for petitioner has already had his precise claim decided against him once, curiously enough a circumstance considered favorable for him, and because "[t]here can be no room for doubt that such a circumstance [conviction for failure to obey a possibly invalid order] 'inherently re-

---

[19] See, *e. g., Sunal* v. *Large,* 332 U. S. 174, 179 (1947).

[20] See, *e. g., DeMarco* v. *Willingham,* 401 F. 2d 105, 106 (CA7 1968); *Lothridge* v. *United States,* 441 F. 2d 919 (CA6 1971).

sults in a complete miscarriage of justice' and 'present[s] exceptional circumstances' that justify collateral relief under § 2255." It is difficult to see that this process of selection rests upon any reasoned distinctions which may be derived from either the statute or the cases.

## V

The Court's rather brief dismissal of the Government's arguments in this case might be understandable were the issues of less importance, or the result less likely to produce severe repercussions. After all, the scope of § 2255 relief has been undefined for almost 25 years and it might be supposed that continuation of this state of affairs would cause no unusual difficulties. But the potential consequences of the Court's decision today make a *laissez-faire* attitude inappropriate. For, "[a]ssuming that there 'exists,' in an ultimate sense, a 'correct' decision of a question of law, we can never be assured that any particular tribunal has in the past made it: we can always continue to ask whether the right rule was applied, whether a new rule should not have been fashioned." Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 447 (1963). Two examples will suffice as illustrations.

(1) This Court occasionally, though not with great frequency, is called upon to resolve conflicts among the courts of appeals on nonconstitutional criminal questions. For example, in January of 1974, the Court decided *United States* v. *Maze,* 414 U. S. 395, a case in which we were asked to resolve a conflict among the courts of appeals concerning the circumstances under which fraudulent use of a credit card might violate the federal mail fraud statute. The Courts of Appeals for the Sixth and Tenth Circuits had construed the scope of the statute somewhat more narrowly than five other

courts of appeals. In *Maze* we approved the minority approach, agreeing with the Sixth Circuit that the respondent's conviction under the mail fraud statute should be reversed.

The Court's decision today seems to provide full opportunity for all defendants convicted under the Mail Fraud Act in the circuits whose view was not accepted to relitigate those convictions in a § 2255 proceeding. Most of those convictions have received full appellate review, and many defendants had unsuccessfully sought certiorari in this Court. The district courts, faced with this influx of motions, will be faced with the difficult task of sifting through various factual claims to determine if the principles of *Maze* should be applied. I suspect that the burden will not be inconsiderable.

(2) The Court of Appeals for the Ninth Circuit, in affirming the dismissal of petitioner's § 2255 motion, cited its own decision in *Odom* v. *United States*, 455 F. 2d 159 (1972). That case involved the question of whether the petitioner was entitled to the benefit of *Wade* v. *United States*, 426 F. 2d 64 (1970), a case which had established new law on insanity for the Ninth Circuit. At the time *Wade* was decided the Court of Appeals specifically held that the decision should apply only to "convictions [which] have not become final as of the date of this decision." [21] Under my reading of the Court's opinion in this case, however, petitioner Odom and anyone else who had raised an insanity defense in the Ninth Circuit may now proceed to file § 2255 motions in the District Court. For Davis' conviction was as final as Odom's conviction, and no basis is evident for saying that one decision is less a "law of the United States" than the other.

---

[21] 426 F. 2d, at 74.

The effect will be twofold. First, federal courts which are already overburdened with cases will find that burden increased. As Mr. Justice Jackson noted in *Brown* v. *Allen*, 344 U. S. 443, 537 (1953) (concurring in result): "It must prejudice the occasional meritorious application to be buried in a flood of worthless ones." Second, there will be substantial disincentive for federal courts to overthrow settled doctrines, no matter how salutary new ones might seem. Although enlightened jurisprudence may call for adopting new policies or correcting errors of interpretation, any court considering such changes must be constantly aware that numerous final convictions will thereupon be placed in jeopardy. The possible, and often undeserved, advantage to a particular litigant is thus obtained at a cost to the entire judicial system.

These examples unfortunately may be multiplied. Admittedly, the Court does attempt to set a minimum threshold for such claims, requiring " 'a fundamental defect . . . inherently result[ing] in a complete miscarriage of justice,' " and " 'exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent.' " (*Ante,* at 346.) This dictum, it is hoped will partially offset the effect of the holding in this case, though if this petitioner's case represents a miscarriage of justice it is hard to imagine one that does not. But one must be concerned that the Court, having taken this giant step so casually, may find the next step equally easy to take, allowing perhaps challenges to evidentiary rulings and other trial matters heretofore considered inappropriate for federal habeas corpus.

## VI

The decision in this case cannot reasonably be explained by the maxim "Hard cases make bad law," for although the law made is bad the case is not hard.

Whatever reason there might be to strain the contours of § 2255 to permit relief to someone visited with obvious injustice, the fact is that this petitioner has had full opportunity to make his case at every stage of the way. He has alleged no deprivation of his rights to a full and fair hearing at trial, no deprivation of his right to appeal, no inability to get adequate consideration on appellate review. He simply alleges that had his case been appealed at a different time he would have won it. I cannot find that those circumstances are so exceptional as to warrant the result reached today.

I therefore dissent from the Court's opinion. Were I persuaded otherwise, on that score, however, I would nonetheless agree for the reasons stated by MR. JUSTICE POWELL in his concurring and dissenting opinion, *ante,* p. 347, that the judgment should be affirmed.