**Rogers SHORT, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

Nos. 97–CV–0061H.

94–CR–71E.

United States District Court, W.D. New York.

Jan. 20, 1998.

Patrick J. Brown, LoTempio & Brown, Buffalo, NY, for Petitioner.

Rogers Short, Lompoc, CA, pro se.

Paul J. Campana, U.S. Atty., Buffalo, NY, for Respondent.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this application for relief pursuant to 28 U.S.C. § 2255. On November 13, 1997, an evidentiary hearing was held on the issue of whether trial counsel's assistance was effective within the meaning of the Sixth Amendment. For the following reasons, petitioner's application is denied.

### BACKGROUND

On July 1, 1994 petitioner entered a guilty plea to a one-count indictment charging him with bank robbery. On August 26, 1994 Hon. John T. Elfvin sentenced petitioner to a 78–month prison term and ordered him to pay a special assessment and restitution. On September 8, 1994, a corresponding judgment of conviction was entered, and no direct appeal was filed. Petitioner was represented by Assistant Federal Public Defender John Humann, Esq., at both his plea hearing and sentencing hearing.

On January 31, 1997 petitioner filed this application to vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255 (Item

12). Petitioner asserted the following grounds for § 2255 relief:

1. Ineffective assistance of counsel for advising petitioner to plead guilty without an evaluation of petitioner's mental capacity;

2. Abuse of discretion by the court for failing to question counsel about petitioner's history of mental illness;

3. Denial of due process based on the court's acceptance of the guilty plea without a psychiatric or psychological evaluation; and,

4. Ineffective assistance of trial counsel for failing to appeal the sentence imposed, which was in excess of the sentence represented by the government in the plea agreement.

On March 3, 1997 the government moved to dismiss the application. On May 21, 1997 Judge Elfvin granted the government's motion to dismiss grounds 2 through 4. However, Judge Elfvin denied the motion to dismiss petitioner's ineffective assistance claim as it pertains to advice rendered in the absence of a mental capacity evaluation. In his memorandum and order, Judge Elfvin stated that petitioner "made a sufficient showing to be entitled to an evidentiary hearing on his ineffective assistance of counsel claim." *Short v. United States*, 1997 WL 276229, at * 2 (W.D.N.Y. May 21, 1997) (Item 20, p. 10).

On May 22, 1997, Judge Elfvin referred this matter to the undersigned for the purpose of assigning counsel to represent petitioner, conducting an evidentiary hearing on petitioner's claim of ineffective assistance of counsel, and filing a report and recommendation pursuant thereto (Item 21). In accordance with this referral, the court assigned counsel (Item 22), and the parties subsequently consented to have the undersigned conduct all further proceedings (Item 24).

The hearing took place on November 13, 1997 before the undersigned. As an initial matter, the court addressed Mr. Humann's motion to quash the respondent's subpoena directing members of the Federal Public Defender's Office to testify at the hearing (Item 25). After petitioner expressly waived the attorney-client privilege as to the issues involved in the hearing, the court denied the motion.

The court then heard testimony from three witnesses: FBI Special Agent Thomas Minton, Assistant Federal Public Defender Kimberly A. Schechter, Esq., and Mr. Humann. Petitioner did not testify.

Agent Minton testified that in April of 1994, he was assigned to the bank robbery squad of the Buffalo FBI office. He conducted an investigation of a robbery at the Bailey/Kensington branch of the Marine Midland Bank, which occurred on April 11, 1994. He retrieved evidence collected by the Buffalo Police Department, including latent fingerprints, items of clothing and a demand note (Ex. 2). He also received bank surveillance photographs (Exs. 1A and 1B).

On May 4, 1994, Agent Minton responded to a tip that the individual who conducted the April 11, 1994 robbery was in the vicinity of the bank. He proceeded to the area, accompanied by Special Agents Gary Adams and Michael McKinney. Upon arriving at the bank, Agent Minton observed petitioner standing outside the bank. He recognized petitioner from the bank surveillance photograph. Petitioner began walking south on Bailey Avenue. He turned east on Kensington Avenue, and stopped to urinate on the side of a building. The agents parked their car and approached petitioner. One of the agents called to petitioner to get his attention. Petitioner initially appeared to be agitated, but became calm and cooperative when the agents explained that they were not concerned about his urinating in public but wanted to speak with him about another matter. Petitioner agreed to accompany the agents to the FBI office in downtown Buffalo.

Agent Minton testified that upon arriving at the downtown FBI office, he advised petitioner that he wanted to ask him about his involvement in the April 11 bank robbery. Before conducting the interview, Agent Minton read petitioner his *Miranda* rights. Petitioner acknowledged his understanding of his rights, and signed a "Waiver of Rights" (Ex 3). Minton then showed petitioner the bank surveillance photographs. Petitioner

stated that it was him depicted in the photographs. He wrote on the back of one of the photographs, "This is me, Rogers Short" (Ex. 1B).

During the interview, petitioner admitted that he committed the robbery. He stated that prior to the robbery he went to the Salvation Army store a few blocks from the bank and obtained a long winter coat and hat, which he wore during the robbery. Upon leaving the bank after the robbery, he discarded the coat and hat outside the bank and returned to the Salvation Army store to obtain other clothing. Petitioner made a written statement to this effect (Ex. 4).

Ms. Schechter was called by petitioner as the next witness. Ms. Schechter testified that she interviewed petitioner on May 5, 1994, in the court lock-up prior to his initial appearance before the undersigned, at which she was assigned to represent him. He was loud and agitated during the interview. She questioned petitioner about his mental health. He told her that he was schizophrenic, and had been in several psychiatric hospitals over the years. He also told her that he had previously been incarcerated in a federal prison in Missouri, and had spent part of that incarceration in the hospital of that facility. Ms. Schechter testified that she attempted to obtain medical records from the hospitals identified by petitioner. She handled the case from May 5, 1994 until June 10, 1994, when Mr. Humann joined the Federal Public Defender's Office and took over the case.

Ms. Schechter testified that Investigator George Thompson from the Federal Public Defender's Office interviewed petitioner on May 10, 1994. Ms. Schechter made notes of a telephone conversation with Mr. Thompson on that day during which Mr. Thompson indicated that petitioner was "nonsensical" during the interview (Ex. 21). She also received a typed report in which Mr. Thompson stated that petitioner "became belligerent, talked irrationally" and "was agitated" during the interview (Ex. 18).

Ms. Schechter testified that she interviewed petitioner at the Monroe County Holding Center on May 18, 1994. He told her that he was receiving his Prolixin. She first learned of petitioner's need for Prolixin during the initial interview on May 5. He told her during the initial interview that he had last taken his Prolixin in December, 1993, and that he was drunk when he robbed the bank. She could not recall whether she asked petitioner if his failure to take Prolixin had any effect on his behavior on the day of the robbery.

Ms. Schechter testified that petitioner was much quieter and more pleasant during the May 18 interview than he was during the May 5 interview. He said some unusual things during the initial interview, and exhibited signs of drinking. Ms. Schechter testified that she has extensive work history in the area of mental health, and is familiar with the characteristics of individuals diagnosed with undifferentiated schizophrenia. She testified that petitioner appeared to be both schizophrenic and drunk. Based on her observations, and the fact that petitioner had told her that he had been in psychiatric hospitals, she was concerned about petitioner's competency to understand the charges against him and assist in his own defense. She testified that she was also concerned about petitioner's competency to commit the robbery that he was charged with.

Ms. Schechter testified that on May 31, 1994, she spoke with Frank Daniels, petitioner's mental health counselor at New Options outpatient clinic. Her notes of that conversation indicate that Mr. Daniels saw petitioner around the time of the robbery. Mr. Daniels told her that petitioner "falls apart at the tail end of his 2-week [Prolixin] shot" (Ex. 23). Her notes did not indicate, and she could not recall, whether she asked Mr. Daniels if petitioner had received his Prolixin shot within a two-week period prior to the time of the bank robbery on April 11. She also could not recall whether she spoke to any health care professionals who actually administered the Prolixin shots to petitioner. She testified that no request was ever made to the court to have petitioner examined in order to determine his mental condition at the time of the robbery.

On cross-examination, Ms. Schechter testified that she considered the legal consequences of petitioner's mental condition from

the time of her very first meeting with him. She passed that consideration on to Mr. Humann when he took over the file in June, 1994. Ms. Schechter represented petitioner at his arraignment. She discussed with him the meaning of an arraignment, and ascertained that he had familiarity with the legal system. She testified that at no time during her representation of petitioner did he demonstrate an incapacity either to understand what the legal proceedings were about or to assist in his defense.

Ms. Schechter testified that she worked for the Erie County Forensic Mental Health Service for five years prior to becoming a lawyer. Her experience involved examining people in the criminal justice system for mental competency and insanity, and arranging for psychiatric commitments when indicated. She was also a counselor at the holding center during that period. Based on this experience, and her subsequent experience as a lawyer, she considered herself capable of recognizing whether petitioner was able to assist in his defense. She testified that she considered asking the court to order a competency examination, but determined that the better course of action would be to wait and see how he responded to his Prolixin treatment. Based on his improved condition the next time she interviewed him, she saw no reason to refer him for a competency examination.

On redirect examination, Ms. Schechter testified that she was familiar with the effects of Prolixin based on her prior work experience. Her notes of the initial interview with petitioner on May 5, 1994 indicate that he had not seen his doctor since December of 1993, but that he "gets prolixin and artane now" (Ex. 16, p. 5). She testified that although she thought petitioner had some psychiatric problems when she saw him on May 5, and she noticed a change in his demeanor between May 5 and the next time she saw him on May 18, she did not believe that he was mentally incompetent. She determined that she would wait and see what the medical records showed. She had "only received a few" of the records at the time she turned the file over to Mr. Humann (Ex. 24).

Mr. Humann testified that he took over petitioner's defense in June of 1994, when he joined the Federal Public Defender's Office. It was very early on in the proceedings. He discussed the case with Ms. Schechter and reviewed the file. He traveled to the Monroe County Jail to see petitioner. He discussed the case with petitioner, and observed that petitioner had been in and out of the criminal justice system many times. Petitioner responded to Mr. Humann's questions, and had a good understanding of what was going on with his case. Mr. Humann had no difficulty determining that petitioner was competent to assist in his defense. He asked petitioner about the circumstances of the robbery, but did not discuss with petitioner whether he was taking his medication at the time of the robbery. On the advice of Mr. Humann, petitioner decided to enter a guilty plea.

Mr. Humann testified that the plea was entered on July 1, 1994 before Judge Elfvin. Upon refreshing his recollection by reading from the transcript of the plea proceedings (Ex. 12), Mr. Humann testified that during the plea colloquy petitioner told the judge that, at the time of the robbery, he was suffering from undifferentiated schizophrenia and had not been taking his medicine. Mr. Humann testified that this was the first time he had heard this information. When he first met with petitioner, Mr. Humann discussed the possibility of pursuing the insanity defense, but petitioner rejected the suggestion because he wanted to get his time over with. He told Mr. Humann that he robbed the bank because he was drinking and he wanted money.

Mr. Humann testified that after the plea was entered petitioner was interviewed by the probation department. Petitioner was accompanied by Federal Public Defender (now United States Magistrate Judge) Jonathan Feldman, Esq. After the interview, a presentence investigation report was prepared in which the probation officer stated his opinion that petitioner suffered from a serious mental illness (Ex. 13).

Mr. Humann testified that on August 26, 1994, he appeared with petitioner before Judge Elfvin for sentencing. Upon refresh-

ing his recollection by reading from the transcript of the sentencing proceedings (Ex. 15), Mr. Humann testified that petitioner again mentioned to the judge that he had not taken his medication on the day of the robbery. None of these instances of petitioner's behavior caused Mr. Humann to reconsider investigating the issue of petitioner's competency at the time of the robbery.

On cross-examination, Mr. Humann testified that he had been a criminal defense attorney for twenty-two years, with extensive trial experience in federal and state courts in all kinds of criminal cases. He first met with petitioner on June 16, 1994. He explained to petitioner that his first option was to try the case. Mr. Humann suggested to petitioner that, based on the strength of the evidence, including the written confession and the surveillance photographs, the only way he could defend the case would be to pursue the insanity defense. In Mr. Humann's opinion, the insanity defense is particularly difficult to raise in federal court, and it is not typically raised in a bank robbery case. With respect to petitioner's case, his statement that he changed his clothes at the Salvation Army both before and after the robbery showed that he thought about how the robbery would be accomplished and how he would conceal his identity. In addition, he said he did it because he was hungry and needed the money. These statements did not fit the scenario of an insanity defense. Petitioner had a lengthy criminal history, including several plea proceedings conducted after he was diagnosed with schizophrenia in 1983. In none of those proceedings was the issue of petitioner's mental competency raised.

Mr. Humann testified that when he discussed these matters with petitioner, petitioner told him that he knew he had to do his time and just wanted to get it over with. He told Mr. Humann he robbed the bank because he was drunk, he was hungry, and he needed the money. Petitioner never told Mr. Humann that he did not know what he was doing at the time of the robbery because he was not taking his Prolixin. The first time Mr. Humann became aware of this was during the plea proceedings. Mr. Humann advised petitioner that if he pursued this tact

there was a potential that the judge might not grant the three-point reduction allowed under the sentencing guidelines for acceptance of responsibility, which was the advantage of taking the plea. In fact, prior to the sentencing, Mr. Humann received correspondence from Judge Elfvin in which he indicated that he was considering not granting the sentence reduction, based on information contained in the presentence investigation report suggesting that petitioner did not fully cooperate with the probation officer during the presentence interview (Ex. 14). Mr. Humann was able to persuade Judge Elfvin to grant the three-point reduction (*see* Ex. 15).

Mr. Humann further testified that he discussed with petitioner the potential sentencing consequences, the benefits of taking the plea, and the importance of the three-point reduction. Petitioner also indicated to Mr. Humann that he wanted to get out of the Monroe County facility as quickly as possible, and that he wanted to take advantage of the counseling, jobs and exercise available at a long-term facility.

The court received Government Exhibits 1A, 1B, 2–4, 5A, 5B, 6–16, 20–23, 30, 31A, 32, and 101–105 into evidence. The court also received post-hearing memoranda from the parties. The sole issue for determination on this petition is whether the testimony and other evidence presented at the hearing establishes that defense counsel rendered ineffective assistance within the meaning of the Sixth Amendment.

## DISCUSSION

### I. 28 U.S.C. § 2255.

As outlined by Judge Elfvin in his prior memorandum and order in this case, 28 U.S.C. § 2255 authorizes a federal prisoner to challenge the legality of his sentence on the ground that the sentence "was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. Although its language refers primarily to the prisoner's "sentence," the statute authorizes post-conviction challenges to both sentences and convictions. *See Davis v. United States,* 417 U.S. 333, 343–344, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). The statute is often referred to

as a "habeas corpus" provision, but rather than authorizing the granting of a writ, the statute provides jurisdiction for a federal court to consider a motion that is, in effect, a continuation of the underlying criminal proceeding. *See Short v. United States, supra,* 1997 WL 276229, at *1 (citing 28 Moore's Federal Practice, § 672.02[2][b] (3d ed.1997)). "Similarly, although prisoners who initiate proceedings pursuant to section 2255 actually file motions rather than petitions, their initial motion papers are generally referred to as petitions, and the prisoners who file them are invariably referred to as petitioners rather than as movants." *Id.*

With these preliminary considerations in place, the court turns to the requirements § 2255 relief based on a claim of ineffective assistance of counsel.

## II. Ineffective Assistance.

In order to succeed on his § 2255 challenge to the conviction in this case, petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, which is determined by the range of competence demanded of attorneys in criminal cases, and (2) prejudice—*i.e.,* a reasonable possibility that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial with the obvious chance of being acquitted. *Hill* v. *Lockhart,* 474 U.S. 52, 56–59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)(citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); (other citations omitted; *see also United States v. Coffin,* 76 F.3d 494, 498 (2d Cir.), *cert. denied,* 517 U.S. 1147, 116 S.Ct. 1445, 134 L.Ed.2d 565 (1996)); *Panuccio v. Kelly,* 927 F.2d 106, 108 (2d Cir.1991). Because the failure to establish prejudice can be dispositive of a § 2255 application, the reasonableness of counsel's representation need not be addressed if the petitioner cannot show prejudice. *Strickland, supra,* 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed."); *see also United States v. Apfel,* 97 F.3d 1074, 1076 (8th Cir.1996).

■ As stated by the Supreme Court in *Hill:*

[T]he resolution of the "prejudice inquiry," *i.e.,* the second prong of the dual showing, is closely related to the objective prediction of whether the defense could succeed if the case went to trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Hill v. Lockhart,* 474 U.S. at 59–60; *see also United States v. Torres,* 113 F.3d 1230 (2d Cir.1997)(unpublished disposition; text at 1997 WL 279893); *United States v. Kauffman,* 109 F.3d 186, 191 (3d Cir.1997) ("[I]f the ineffectiveness alleged was a failure to investigate thoroughly, which in turn caused the defendant to plead guilty, the defendant must show a likelihood that some evidence would have been discovered which would have caused the attorney to change his recommendation to enter into a plea agreement."); *Panuccio v. Kelly, supra,* 927 F.2d at 109 ("The likelihood that an affirmative defense will be successful at trial and an assessment of the probable increase or reduction in sentence relative to the plea if the defendant proceeds to trial are clearly relevant to the determination of whether an attorney acted competently in recommending a plea.").

The Insanity Defense Reform Act of 1984 ("IDRA"), 18 U.S.C. § 17, established a uniform standard for the insanity defense in all federal prosecutions, as follows:

(a) Affirmative defense.—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b). Burden of proof.—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

18 U.S.C. § 17; *see United States v. Garcia,* 94 F.3d 57, 61 (2d Cir.1996); *United States v. Brown,* 899 F.2d 189, 191 (2d Cir.1990).[1] To establish an insanity defense under the IDRA, the defendant must prove by clear and convincing evidence "(1) that he was suffering from a severe mental disease or defect at the time [of] the charged offenses and (2) that his disease or defect rendered him unable to appreciate the nature and quality or the wrongfulness of his acts." *United States v. Hiebert,* 30 F.3d 1005, 1007 (8th Cir.), *cert. denied,* 513 U.S. 1029, 115 S.Ct. 606, 130 L.Ed.2d 516 (1994), *quoted in United States v. Long Crow,* 37 F.3d 1319, 1323 (8th Cir.1994), *cert. denied,* 513 U.S. 1180, 115 S.Ct. 1167, 130 L.Ed.2d 1122 (1995).

■ In this case, upon review of the testimony and evidence presented at the hearing in light of these standards, I find that petitioner has failed to satisfy the "prejudice" prong of the *Strickland/Hill* inquiry. There is nothing in the record to establish that further investigation by the Federal Public Defender, or psychiatric examination of petitioner, would have led to the discovery of any evidence that might have caused counsel to change his recommendation that petitioner take the plea. The medical records support the conclusion reached by both Mr. Humann and Ms. Schechter that petitioner's compliance with his Prolixin therapy rendered him fully able to appreciate the nature and quality or wrongfulness of his acts (see Exs. 31, 32). Therefore, petitioner's trial would have focused on the question whether petitioner was taking his Prolixin at the time of the robbery on April 11, 1994. This question remains unanswered following the evidentiary hearing and post-hearing submissions of the parties.

However, even if petitioner could present proof showing that he was not taking his medication at the time of the robbery, the jury would have the opportunity to consider the evidence tending to show that petitioner was able to appreciate the nature and quality or wrongfulness of his acts. As pointed out by Mr. Humann, petitioner made a written statement in which he admitted that he changed his clothes at the Salvation Army both before and after the robbery. This tends to show that he had thought about the wrongfulness of his act of bank robbery, and decided to conceal it. In addition, petitioner wrote out a demand note, which stated: "Give me all the money you have in the till imm[ed]iately" (Ex. 2). This shows deliberation and planning, rather than mental disease or defect. Finally, the petitioner's burden of proof on this issue at trial would be by clear and convincing evidence.

The record shows that Mr. Humann discussed with petitioner the possibility of successfully establishing an insanity defense at trial and the advantages and disadvantages of accepting the government's plea offer. This was done at a time when petitioner was taking his medication and was clearly competent. Petitioner rejected the trial option outright. He told Mr. Humann that there was nothing to try. He stated that he committed the robbery because he was hungry and he needed the money. He told Mr. Humann that he wanted to take the plea as soon as possible so that he could serve his sentence at a facility where he could work, exercise and get counseling.

By accepting the plea, petitioner received the benefit of a three-point reduction in offense level for acceptance of responsibility. *See* U.S. Sentencing Guidelines Manual § 3E1.1 (1997).[2] Indeed, when the sentenc-

---

1. As explained in *Garcia,* Congress enacted the IDRA, the first federal legislation on the insanity defense, largely in response to public concern over the acquittal of John W. Hinkley, Jr. for the attempted assassination of President Reagan. "In enacting the IDRA, Congress made two substantial changes to the federal insanity defense. First, it narrowed the definition of insanity that had evolved from the caselaw. Second, it shifted to the defendant the burden of proving the insan-

ity defense by clear and convincing evidence." *United States v. Garcia, supra,* 94 F.3d at 61 (citing S.Rep. No. 225, 98th Cong., 1st Sess. 222, 225–26 (1983), *reprinted in* 1984 U.S.C.C.A.N 3182, 3407).

2. Section 3E1.1 of the U.S. Sentencing Guidelines Manual provides:

   *Acceptance of Responsibility*

ing judge expressed his concern about granting the three-point reduction because of petitioner's lack of cooperation with the probation officer during the presentence interview, Mr. Humann was able to convince the judge to grant the reduction (see Exs. 14 & 15).

Furthermore, as set forth in the presentence investigation report (Ex. 13), petitioner's lengthy criminal history includes no less than eight convictions on guilty pleas entered subsequent to the 1983 diagnosis of his schizophrenia. As noted by Mr. Humann in his hearing testimony, there is nothing in the record to suggest that mental competency was at issue in any of these plea proceedings.

Finally, Mr. Humann's evaluation of the likelihood of success of the federal insanity defense at trial, in light of all of the circumstances, is entitled to a strong presumption of reasonableness. *Strickland v. Washington,* *supra,* 466 U.S. at 688–89. These circumstances include Mr. Humann's substantial experience at the criminal defense bar, the considerable strength of the government's case, the lack of clear and convincing evidence as to petitioner's mental condition at the time of the commission of the crime, petitioner's criminal history, his express desire to take the plea, and the availability of the three-level reduction. Petitioner has not come forward with any testimony or evidence to rebut this presumption.

Accordingly, I find that petitioner has failed to show a likelihood that further investigation of his mental health condition by the Federal Public Defender's Office would have led to the discovery of evidence which would have caused Mr. Humann to change his recommendation to accept the plea agreement. Petitioner has therefore failed to demonstrate to this court a reasonable possibility that, but for the lack of further investigation, he would not have led guilty and would have

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b) If the defendant qualifies for a decrease under subsection (a), and the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:

insisted on going to trial with the obvious chance of being acquitted. Because petitioner has failed to establish prejudice, the reasonableness of counsel's representation need not be addressed.

### CONCLUSION

Based on the foregoing, petitioner's application for relief under 28 U.S.C. § 2255 is denied. The Clerk of the Court is directed to enter judgment in favor of respondent in No. 97–CV–0061H, and to enter a copy of this decision and order as a docket entry in No. 94–CR–71E.

**SO ORDERED.**

(1) timely providing complete information to the government concerning his own involvement in the offense; or

(2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,

decrease by 1 additional level.