UNITED STATES of America, Plaintiff,

v.

**Colin NATHANSON, Defendant.**

Case No. SACV 12–01978–CJC.
Case No. SACR 05–00301–CJC.

United States District Court, C.D. California, Southern Division.

June 10, 2013.

Robert J. Keenan, AUSA, Santa Ana, CA, for Plaintiff.

Colin Nathanson, San Pedro, CA, Pro Se, Defendant.

**ORDER DENYING MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. § 2255**

CORMAC J. CARNEY, District Judge.

## I. INTRODUCTION

Petitioner Colin Nathanson is serving a 27–year sentence for organizing and directing a sham investment scheme through which he defrauded more than 2,500 victims of at least $24 million over several years. On October 20, 2008, Mr. Nathanson pleaded guilty to all counts of a six-count indictment charging him with mail fraud in violation of 18 U.S.C. § 1341. He was sentenced by this Court on August 19, 2009. Following his unsuccessful appeal to the Ninth Circuit and petition for writ of certiorari to the United States Supreme Court, Mr. Nathanson now brings this petition for resentencing under 28 U.S.C. § 2255 on the grounds that his sentence was imposed in violation of the Constitution or laws of the United States.

More specifically, Mr. Nathanson contends that this Court improperly considered his poverty when determining his sentence and that he received ineffective assistance of counsel because his trial and appellate counsel failed to object to this consideration. He also argues that the Court incorrectly applied the leadership enhancement under § 3B1.1 of the Sentencing Guidelines when it calculated the applicable advisory guideline range. Mr. Nathanson is wrong. The Court did not increase Mr. Nathanson's sentence because of his poverty. The Court increased his sentence because he did not return the millions of dollars that he stole from thousands of innocent people and did not mitigate the devastating loss that he cruelly inflicted on them. Nor did the Court incorrectly apply the § 3B1.1 leadership enhancement. As aptly stated by the Ninth Circuit when it affirmed Mr. Nathanson's sentence: "The district court properly applied a four-level enhancement to Nathanson's sentence premised on his leadership role in the scheme to defraud." Mr. Nathanson's petition is **DENIED.**

## II. FACTUAL BACKGROUND

Mr. Nathanson, along with his "50/50 business partner" Daniel Rish, concocted a sophisticated Ponzi scheme used by Mr. Nathanson to steal money from unsuspecting investors through a variety of entities including telemarketing businesses, "con-

sulting" firms, media funds, and golf companies.[1] (Dkt. No. 42 [Plea Agreement] ¶ 9(b).)[2] Using the telemarketing entities he controlled, Mr. Nathanson solicited investors to invest in the "Nathanson Investment Trust" ("NIT") from January 2000 through March 2004.[3] (*Id.* ¶ 9(b).) Mr. Nathanson told investors they were purchasing an ownership share in a privately-owned, Internet-based company (the "Internet Company") that had purportedly developed software to enhance advanced Internet security applications. (*Id.*) He caused the investors to be told, *inter alia*, that the Internet Company would soon be proceeding to an initial public offering ("IPO"), that funds were needed to increase the net worth of the Internet Company in advance of the IPO, that each investor would receive an ownership interest in the Internet Company, that each investor's money would be refunded if the IPO did not go forward, and later, that the Internet Company had elected to forego the IPO in lieu of a merger deal with an undisclosed public company. (*Id.* ¶ 9(c).) Mr. Nathanson, with the assistance of Mr. Rish, sent letters to NIT investors representing to them that the money had been invested as promised. (*Id.* ¶ 9(d).) In one letter, Mr. Nathanson wrote: "Thank you very much for the confidence and trust you bestowed upon me, and I want you to know that you can rest assured you're in good hands.... Thanks again for your trust. Very shortly we're going to share this success. I'm really looking forward to that." (Dkt. No. 57 [Victim Letters] Exh. 5 at 2; PSR ¶ 53.) As a result of Mr. Nathanson's activities, several hundred investors sent approximately $28.4 million to NIT for investment in the Internet Company. (Plea Agreement ¶ 9(h).)

In reality, the Internet Company did not exist. Mr. Nathanson has admitted that "the Private Internet Company was utterly fictitious, and there never was a planned IPO or merger negotiations with any Public Company." (*Id.* ¶ 9(e).) The investors' money was never used to acquire an ownership interest in any company; rather, at Mr. Nathanson's direction the investor funds were immediately diverted, misappropriated, and used by Mr. Nathanson and others for unrelated purposes. (*Id.*)

---

1. Mr. Nathanson's plea agreement describes the entities as follows: "Defendant COLIN NATHANSON was responsible for the operation and management of the 'Nathanson Investment Trust' ('NIT'). Investment interests involving NIT and other entities ('the Nathanson/Rish Entities') were sold to the public by telemarketing entities that NATHANSON, acting in concert with DANIEL J. RISH, a longtime friend and business associate who referred to himself and NATHANSON as '50/50 business partners,' established and operated in Orange and Los Angeles Counties (collectively, 'the Telemarketing Entities'). The Telemarketing Entities included, without limitation, Starquest Management, Inc., Whitehawk Consulting Group, Inc., Eaglerock Consulting, and Leafhead Consultants, Inc. Other 'consulting' entities were Camry Consulting Services, Inc. and Yrmac Consulting Services, Inc. ('the Consulting Companies'). The Nathanson/Rish Entities included, without limitation, NIT; the Telemarketing Entities; the Consulting Companies; Giant Golf Company ('Giant Golf'); Play Big Enterprises, Inc. ('Play Big'); various IVDS partnerships/funds that reportedly earned money through use of IVDS licenses; various 'Media Info Funds' that reportedly earned money through discounts upon the purchase of commercial space for Giant Golf/Play Big's infomercial; Millennium Technical Group; MicroVision Systems, Inc.; Media International; and Media Entertainment LLP d/b/a/ 'WePlayPoker.com.'" (Plea Agreement ¶ 9(a).)

2. All references to docket numbers refer to the criminal docket in this case, SA CR 05–301–CJC.

3. While the NIT scheme began in 2000, some of the victims invested in various schemes conducted by Mr. Nathanson as early as 1994. (Dkt. No. 48 [Presentence Investigation Report ("PSR")] ¶ 38.)

For example, $8.8 million was used to fund Mr. Nathanson's failing golf businesses Play Big and Giant Golf, and over $10.5 million was transferred to other entities, partnerships, companies, and funds controlled by Mr. Nathanson and Mr. Rish. (*Id.* ¶ 9(h).) Mr. Nathanson spent $2.1 million of NIT investment money on indulgent personal expenses, including gambling expenses and three homes located in Coto de Caza and Trabuco Canyon, California. (PSR ¶ 27.)[4] Only $4,297,723 was returned to investors as refunds and payments. (Plea Agreement ¶ 9(h).)

In addition to the NIT scheme, Mr. Nathanson and Mr. Rish organized the sale and offering of other unregistered securities through fraudulent means. (*Id.* ¶ 9(i).) Mr. Nathanson solicited investment in Giant Golf and Big Play by falsely representing that the companies were successful and on the verge of an IPO. (*Id.*) But in fact, Giant Golf and Big Play never made any net profits from operations and never went public. (PSR ¶ 30.) Mr. Nathanson solicited investments in other entities he controlled with Mr. Rish, including "WePlayPoker.com" and partnerships involving Interactive Video Data Service ("IVDS") licenses purchased at Federal Communications Commission auctions. Investors were falsely told that these investments paid returns between 2–5% per month. (*Id.* ¶ 9(i).) Like the investments made in the NIT scheme, funds invested in Mr. Nathanson and Mr. Rish's other entities were diverted to pay off other investors or directed to unrelated activities. *Id.* Mr. Nathanson undertook these sales despite the fact that he had been ordered to

cease and desist from selling unregistered securities by the state of California in 1994, the state of Ohio in 2002, and the state of North Dakota in 2004. (*Id.* ¶ 9(f).) These orders were never disclosed to investors. Mr. Nathanson also did not disclose to investors that he had been under investigation by the Securities and Exchange Commission ("SEC") since 2003. *Id.*

Mr. Nathanson's schemes had devastating impacts on his victims.[5] He deceived thousands of individuals, including his own employees. The Court reviewed letters from victims and heard victim testimony at Mr. Nathanson's sentencing hearing, including the following excerpts. Edward W. wrote as follows:

> I invested a total of $30,075 in four separate transactions between 1993 and 1995.... The significance of my losses is great to me and my family, I would likely be using the money, and its (hopefully) appreciated value over the years to help finance the education of my ten grandchildren. Now this will be impossible. As a family physician, now retired after 44 years in practice, I cannot fully fathom, nor express my dismay over being "taken" by Mr. Nathanson and his associates. I hope you will consider my story, as well as that of many other investors, and *impose the maximum sentence* on Mr. Nathanson. He has done irreparable harm to so many!!!

(Victim Letters Exh. 4 (emphasis in original).) Another investor submitted the following:

---

4. Mr. Nathanson maintains that this figure is overstated. (Dkt. No. 54 [Def.'s Letters to the Court] at 2.)

5. The Receiver appointed in the related SEC civil case calculated that Mr. Nathanson's schemes had a total intended loss of $55,331,374. Because $9,196,420 was ulti-

mately returned to investors, the actual loss was determined to be $46,134,954. (PSR ¶ 35.) Mr. Nathanson disputed these amounts. The parties agreed to an actual loss of $24,102,085 attributable to the NIT scheme, but did not reach an agreement on the loss caused by the other entities and schemes. (Plea Agreement ¶ 9(j).)

My name is Richard M P. I represent my father Herbert P and my brother Steven P. Collectively we invested one hundred thousand dollars in Colin Nathanson's deception. The money had been intended for our daughters (2) college education which is to begin soon. The quality and ability to finance their future schooling has been deeply compromised. When Mr. Nathanson and his employee Sheila Green look you in the eyes and lie repeatedly for three years with the intention to harm and deceive, the light of humanity is greatly dimmed. I pray that the punishment you hand down will be *abundantly* clear to him and to others, who may seek to harm in this heartless and unconconscionable [sic] way!

(*Id.* Exh. 1 (emphasis in original).) A New York attorney submitted a letter on behalf of his client, stating in part:

Fred N invested $23,000 in Millennium Technical Corp—one of Nathanson's corporations that he was taking public with "an IPO". Mr. N unfortunately believed the positive letters he received from Nathanson and colleagues and continued to pour his hard earned money into this flim-flam.... It is truly tragic for him and many others. This man belongs in jail. There are no assets to be recovered.

(*Id.* Exh. 3.) At Mr. Nathanson's sentencing hearing, the following was read to the Court by one victim on behalf of another:

I, Deanna Aikens, a former employee of his, was disinstated [sic] to learn that Mr. Nathanson had used so many people financially and he had deceived many more. I thought my stock in the company was going to provide me with a future necessary egg and means of one day retiring with some stability in my senior years. I was a very dedicated and committed employee. I worked very hard at this firm. I lived in a one-bedroom apartment and drove a clunker truck, but I thought that one day I would own a home and drive a new car if I kept working hard for Mr. Nathanson. While he was out spending the millions driving a fancy car, traveling the world and living like a king, I was just happy to have a job and an apartment and a truck that broke down every couple of months.... But after Mr. Nathanson was arrested, I lost my job. I had to rent a room in a lady's house and eventually moved out of stated [sic] to my sister's home. For six months I slept in my sister's couch and in 2005 I was able to get a minimum wage job. I retrieved clothes out of my suitcase for six months and I have not even clothes dresser to my name.... I will be forever changed by crossing paths with Mr. Nathanson. Changed for the worse. I will never trust another consulting or marketing firm, and I was damaging [sic] emotionally, mentally and physically by his cunning and criminal doing and left broke. Shame on you, Mr. Nathanson, for your ruining for family, your friends, your employees and your clients' lives. How dare you spend your life living off other people's money.... May God have mercy on all those inflicted with your evil greed and on those who were affected by it forever.

(Dkt. No. 92 [Reporter's Tr. of Proceedings ("Tr.")] 9:15–11:6.) Mr. Carl Adair, also a former employee of Mr. Nathanson, appeared in person at his sentencing hearing and addressed the Court:

You see, I was employed by Colin's various scam companies from 1993 until they were shut down by the SEC in March of 2004.... I was employed by Colin to sell shares in this dizzying array of companies and was paid a salary but, more importantly, given stock certificates. Here is an exhibit of the phony stock certificates in these companies

with the promise of them going public. That's a real joke. You can paper your walls with those, Colin.... One day he brought us into his office and stated, "If you ever do anything in your life, including your family and friends, put it in the trust because it will be your future and your retirement." Well, a scumbag trick, you are, Colin. There never was a secret company. And you took the money to buy extravagant homes, cars and gambling debts in Vegas that were enormous. Now look how many lives you have ruined. Look at this. These are just some of my clients. My good friend Jack Jetney from Santa Barbara, 275,-000. I won't go through all the names but it totals $3 million, just partial of my clients. I had close to, over the years, damn near a thousand clients. Me, alone. And we had a bunch of other workers there too who had clients. So I don't think 2500 is correct, frankly.... Finally, you sentenced me at 69 years of age to work until the day I die. Colin, you have robbed me of my savings, my retirement and the trust of my family and friends. You are an evil person. You are evil personified and I feel you should be sentenced to life in prison without the possibility of parole. Why? Because once you get out, you are going to—your track record shows you are going to start up scams as usual, ponzi schemes, and rob more innocent people for your own greedy, personal gratification. As far as I'm concerned, rot in hell."

(*Id.* 11:19–13:14.) Although Mr. Nathanson stole millions of dollars, the Receiver informed the Court that the "victims actually got zero money back." (*Id.* 22:5.)

## III. SENTENCING HEARING AND PROCEDURAL BACKGROUND

This Court sentenced Mr. Nathanson on August 19, 2009. The Court first gave its guidelines sentence analysis and then discussed applicable aggravating and mitigating circumstances in Mr. Nathanson's life and offense not captured by the guidelines. The Court heard statements from victims, Mr. Nathanson, and the Receiver, as well as arguments by counsel for Mr. Nathanson and the Government.

The Court calculated an offense level of 40. (Tr. 5:16.) The Court applied a base offense level of seven pursuant to USSG § 2B1.1(a)(1)(B) and a 22–level enhancement for an actual and intended loss amount between $20 million and $50 million pursuant to § 2B1.1(b)(1)(L). (*Id.* at 5:17–18.) The Court found it unnecessary to litigate and make factual findings regarding the Receiver's calculation that the intended loss amount was over $50 million given that a 22–level enhancement was already substantial. (*Id.* at 5:18–24.) The Court added a six-level enhancement pursuant to § 2B1.1(b)(2)(C) because the offenses involved more than 250 victims, and also applied a two-level enhancement for violation of administrative orders under § 2B1.1(b)(8)(C). (*Id.* 5:25–6:9.) The Court next applied a four-level leadership enhancement under § 3B1.1(a). (*Id.* 6:10–16.) The Court further found that a two-level enhancement for abuse of trust under § 3B1.3 was appropriate, as was a two-level enhancement for obstruction of justice under § 3C1.1. (*Id.* 6:17–7:1.) The Court applied a three-level downward adjustment for acceptance of responsibility under § 3E1.1 and a two-level downward departure under § 5K1.1 because Mr. Nathanson provided substantial assistance to the government. (*Id.* at 7:2–5.) Because Mr. Nathanson had no prior criminal history, this calculation led to a sentencing range of 292 to 365 months. (*Id.* at 7:8–9.)

The Court next considered aggravating or mitigating facts and circumstances of Mr. Nathanson's life and offense that were not accounted for in the guideline range.

The Court was unable to identify any mitigating facts and circumstances, but did identify four aggravating facts or circumstances that were not fully captured by the guidelines. (*Id.* at 7:15–18.) First, the Court noted that the six-level enhancement for the number of victims being over 250 did not accurately capture the magnitude of the fraud, which had 2500 victims. (*Id.* at 7:18–25.) Second, the Court stated that it was troubling that there was no possibility of restitution in this case, which meant the victims would not get their money back. (*Id.* at 8:1–7.) Third, the Court pointed out that Mr. Nathanson used some of the money for "a comfortable lifestyle." (*Id.* at 8:8–14.) Finally, the Court emphasized "most significantly, I don't think the guidelines really reflect the impact on the victims and the mental distress and their torment of this offense and how they lost their money." (*Id.* at 8:15–18.) After considering all the factors and objectives of sentencing under 18 U.S.C. § 3553, including the nature and circumstances of Mr. Nathanson's offense and the need for the sentence imposed to provide just punishment, the Court imposed a mid-guideline range sentence of 324 months, or 27 years. The Court stated:

> Mr. Nathanson's crimes were terrible and incredibly serious ones. Over the course of many years he took advantage and betrayed the trust of at least 2500 people for a loss in the millions of dollars. The victims have lost their savings, their retirement and their security and peace of mind. To compound matters, Mr. Nathanson engaged in this fraud after being told by regulatory authorities that he could not market and sell his securities to people. And then he even lied to the Court to conceal his fraud. I believe a sentence of 27 years is necessary here to achieve the important objectives of 3553.... And I believe that a mid guideline range sentence is the appropriate sentence here.

> Again, this was an enormous fraud. There is nothing I can do to ease their pain. And I agree with [defense counsel], that the punishment has to fit the crime. But committing this type of fraud over this extended period of time involving this amount of money, with this many victims, I believe, in essence, a life sentence is the appropriate punishment.

(*Id.* at 37:12–38:13.) The Court did not order mandatory restitution "because an offense against property is involved, the number of identifiable victims is so large as to make restitution impracticable, and determining complex issues of fact related to the cause or amount of victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." (*Id.* at 40:16–22.) The Court waived all fines, finding that Mr. Nathanson did not have the ability to pay one. (*Id.* at 40:23–24.)

The Ninth Circuit affirmed Mr. Nathanson's sentence on December 15, 2010, 406 F'ed.Appx. 162 (9th Cir.2010). (Dkt. No. 102 [Gov.'s Exhs. in Supp. of Answer ("Gov.'s Exhs.")] Exh. E.) On March 25, 2011, the Ninth Circuit amended its prior memorandum disposition, denied Mr. Nathanson's petition for rehearing, and rejected his suggestion for rehearing en banc. (*Id.* Exh. G.) On June 22, 2011, Mr. Nathanson filed a petition for writ of certiorari with the Supreme Court, which denied the petition on November 14, 2011,- —— U.S. ——, 132 S.Ct. 574, 181 L.Ed.2d 421 (2011). (Dkt. No. 95 [Pet.'s Mem. in Supp. of Mot.] 11, 12.) Through his present § 2255 petition, Mr. Nathanson reiterates his arguments that the Court improperly considered his inability to pay restitution as an aggravating sentencing factor and improperly imposed a four-level leadership enhancement.

## IV. ANALYSIS

Congress enacted 28 U.S.C. § 2255 "to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Davis v. United States,* 417 U.S. 333, 343, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). The statute authorizes a sentencing court "to discharge or resentence a defendant," but it "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). A prisoner may attack his or her sentence on four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States, (2) the court was without jurisdiction to impose such sentence, (3) the sentence was in excess of the maximum authorized by law, or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). A § 2255 petitioner is entitled to an evidentiary hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

### A. INABILITY TO PAY RESTITUTION

In sentencing Mr. Nathanson, the Court considered the financial impact that his crimes had on his victims. Mr. Nathanson argues that this consideration was unconstitutional because it amounted to an increase in his sentence based on his inability to pay restitution. He relies on the Ninth Circuit's decision in *United States v. Burgum,* in which the panel majority vacated a sentence imposed by this Court because it believed that this Court had violated "the well settled principle that inability to pay restitution does not justify

an imposition of a longer term of imprisonment." 633 F.3d 810, 814 (2011). Mr. Nathanson's claim (the "restitution claim") is procedurally barred and substantively without merit.

As a procedural matter, Mr. Nathanson waived his right to collaterally challenge his sentence as part of his plea agreement. The right to bring a collateral attack through a § 2255 petition is statutory and "[a] knowing and voluntary waiver of a statutory right is enforceable." *United States v. Abarca,* 985 F.2d 1012, 1014 (9th Cir.1993); *see also United States v. Pruitt,* 32 F.3d 431, 433 (9th Cir.1994) ("[A] defendant may waive the statutory right to file a § 2255 petition challenging the length of his sentence."). Paragraph 24 of the plea agreement entered into by Mr. Nathanson on October 15, 2008 states:

> Defendant waives and gives up any right to bring a post-conviction collateral attack on his conviction and sentence except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in applicable sentencing statutes or statutes of conviction.

This provision is unambiguous, and Mr. Nathanson attested that he carefully read the plea agreement, had time to review and consider it, discussed every part of the agreement with his attorney, understood the terms of the agreement, and voluntarily agreed to those terms. (Plea Agreement at 23–24.) Accordingly, the Court finds that Mr. Nathanson knowingly and voluntarily waived his right to bring his restitution claim, which is not based on ineffective assistance of counsel, newly discovered evidence, or any explicitly retroactive change in any applicable statutes.[6]

---

**6.** In his reply brief, Mr. Nathanson argues that he and his counsel understood that the waiver "applied only if Mr. Nathanson received a sentence of 78 or 63 months, respectively, or less" and that "[n]either Mr. Nathanson nor his counsel intended to waive

Mr. Nathanson's right to seek collateral relief if Mr. Nathanson was sentenced outside the agreed-upon range." (Pet.'s Reply Br. at 13.) This position is not supported by the plain, unambiguous language of the plea agreement,

█ Even if the Court were to overlook this procedural bar, Mr. Nathanson's restitution claim still fails because a court is entitled, and indeed is obligated, to consider the devastating harm, financial or otherwise, that is inflicted on victims. It is unquestionably true that a court cannot impose a heightened sentence on a defendant because he is too poor to pay a fine or restitution. *Bearden v. Georgia,* 461 U.S. 660, 667–68, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983) ("[I]f the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it."); *Tate v. Short,* 401 U.S. 395, 398, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971) ("[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full."); *Williams v. Illinois,* 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) ("[A] State may not constitutionally imprison beyond the maximum duration fixed by statute a defendant who is financially unable to pay a fine."). But "[a] defendant's poverty in no way immunizes him from punishment" and nothing "precludes a judge from imposing on an indigent, as on any defendant, the maximum penalty prescribed by law." *Bearden,* 461 U.S. at 669–70, 103 S.Ct. 2064 (quoting *Williams,* 399 U.S. at 243, 90 S.Ct. 2018). The Supreme Court has recognized that there is a "delicate balance between the acceptability, and indeed wisdom, of considering all relevant factors when determining an appropriate sentence for an individual and the impermissibility of imprisoning a defendant solely because of his lack of financial resources." *Id.* at 661, 103 S.Ct. 2064.

The record clearly shows that the Court did not punish Mr. Nathanson because of his poverty. At his sentencing hearing, the Court was only noting that the harm Mr. Nathanson had caused his victims was irreparable:

> I thought it was also troubling, realistically, that there is no possibility of restitution in this case. And I sense some of the victims have recognized that and realized it, and I don't know whether it was almost insulting, getting a $100 check from the receiver as I understand what they got. Maybe it would be better not to have anything. But they're not going to get their money back.

(Tr. at 8:1–7.)

█ The Court's consideration of the irreparable financial harm that Mr. Nathanson caused his victims was entirely appropriate. In enacting 18 U.S.C. § 3553, Congress directed courts to consider a variety of factors in sentencing, including "the nature and circumstances of the offense" and "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(1), (2). Particularly, § 3553(a)(1) "provides a natural and necessary basis for placing the actions of an individual defendant in the broader context of the crime he or she committed." *United States v. Wills,* 476 F.3d 103, 110 (2d Cir.2007), *abrogated on other grounds as recognized in United States v. Cavera,* 550 F.3d 180, 191 (2d Cir.2008). Recognition of the victims and their injuries is integral to understanding the broader context of the crime and in determining the seriousness of the offense and what is just punishment in a specific

(*see* Plea Agreement at 20–21), which attached certain conditions to Mr. Nathanson's waiver of appeals and not to his waiver of his right to bring a collateral attack. *See United States v. Anglin,* 215 F.3d 1064, 1066 (9th Cir.2000) ("The scope of a knowing and voluntary waiver is demonstrated by the express language of the plea agreement.").

case. *See, e.g., United States v. Schlueter,* 634 F.3d 965, 967 (7th Cir.2011) (affirming above-guideline range sentence where defendant "conned not just vulnerable [elderly] victims out of large sums of money, but because he took advantage of personal relationships to cheat them out of significant sums they needed at critical stages of their lives"); *United States v. Lalonde,* 509 F.3d 750, 771 (6th Cir.2007) (holding that sentence at the high end of guideline range was reasonable "given the seriousness of Lalonde's scheme which defrauded over $1.6 million dollars from several individuals and caused major financial and emotional disruption in those victims' lives"); *United States v. Martin,* 455 F.3d 1227, 1239 (11th Cir.2006) (seven-day sentence was unreasonable in part under § 3553 because sentence did not reflect the seriousness of a crime that "resulted in over a billion dollars of loss harming thousands of victims").[7]

The Ninth Circuit and other appellate courts consistently have affirmed sentences that recognize the financial harm to the victims of a defendant's fraud. *See, e.g., United States v. Meeker,* 411 F.3d 736, 747 (6th Cir.2005) (upward departure was appropriate where guidelines range did not account for the severe financial harm the defendant caused his family and friends by defrauding them of their retirement funds

and wasting the money on gambling and risky investments); *U.S. v. Kaye,* 23 F.3d 50, 53 (2d Cir.1994) (upward departure based on the degree of the harm was justified where defendant defrauded his great-aunt of her life savings, resulting in "so great an impact ... as to leave her financially dependent on the generosity of others, quite possibly for the rest of her life"). In *United States v. Rangel,* the Ninth Circuit considered the sentence imposed on a defendant who engaged in a fraudulent Ponzi scheme and held that "the district court did not impermissibly rely on [the defendant's] inability to pay restitution by considering the financial impact his crimes had on his victims." 697 F.3d 795, 799 (9th Cir.2012). The Ninth Circuit clarified that there is not "an absolute bar to considering the possibility of restitution" and that the consideration of a defendant's inability to pay restitution is permissible when focused "on the impact on the victims of [the defendant's] crimes" rather than as an aggravating factor in and of itself. *Id.* at 804. A sentencing court's concern about the ability to pay restitution may thus be appropriate when "not designed to punish [a defendant] for his inability to pay." *Id.; see also United States v. Anekwu,* 695 F.3d 967, 989 (9th Cir.2012) (district court's reference to inability · to pay restitution explained to the victims that they should not expect to receive the restitution amount ordered).[8]

---

**7.** In its report discussing the Mandatory Victims Restitution Act of 1996, the Senate Committee on the Judiciary stated: "It is essential that the criminal justice system recognize the impact that crime has on the victim, and, to the extent possible, ensure that the offender be held accountable to repay those costs." S. Rep. No. 104–179, at 18 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 931. One court has commented that the enactment of statutes like the Victim and Witness Protection Act "has increased the obligation of courts to consider the victims' need for emotional healing and financial compensation within the context of criminal law." *United States v. Ferranti,* 928 F.Supp. 206, 221 (E.D.N.Y.1996), *aff'd sub*

*nom. United States v. Tocco,* 135 F.3d 116 (2d Cir.1998) (detailing development of law of restitution).

**8.** Although the case law does not distinguish between a fine and restitution, the two legal principles are very different. *United States v. Leigh,* 276 F.3d 1011, 1013 (8th Cir.2002) ("But fines and restitution are different and are treated differently both by the Sentencing Guidelines and the United States Code."); *United States v. Gabriele,* 24 F.3d 68, 71 (10th Cir.1994) ("[T]he underlying penal philosophy for restitution is different than that for a fine," although the impact on the defendant is the same.); *see also United States v. Davis,*

This Court's discussion of the loss inflicted on the victims was particularly salient in this case, where Mr. Nathanson stole the savings and retirement funds from thousands of individuals and their families. For example, 69 year old Mr. Adair was not simply defrauded of money; his retirement years have been robbed from him. Richard M P and his family members lost more than $100,000; they lost the security of knowing they could afford to educate their children. And neither these nor any of Mr. Nathanson's other victims will ever get their money back because Mr. Nathanson wasted their money on gambling, lavish homes, and risky investments. Quite frankly, the Court is at a loss to understand how Mr. Nathanson can criticize the Court for considering the fact that he irreparably harmed his victims and will never be able to mitigate their suffering. *See Rangel,* 697 F.3d at 804 (sentencing court's concern over defendant's inability to pay restitution because of impact on victims was appropriate). Indeed, the Court was only complying with its duty under § 3553 to consider the full nature and all the circumstances of Mr. Nathanson's crime so it could achieve the important sentencing objective of imposing just punishment. *Id.* at 803 ("A sentencing court is empowered to consider whether the victims will receive restitution from the defendant in varying from the Sentencing Guidelines based on § 3553(a) factors."). Mr. Nathanson's sentence would have been an unjust and unduly

---

706 F.3d 1081, 1084 (9th Cir.2013) ("Money levied as a punitive fine does not 'double' the money intended to compensate a loss anymore than the addition of apples to one's store doubles the orange stock."). A fine is a "pecuniary criminal punishment or civil penalty payable to the public treasury." Black's Law Dictionary 708 (9th ed. 2009). The purpose of a fine is to punish the defendant, reflect the serious of the offense, promote respect for the law, and deter future wrongful conduct. *See* USSG § 5E1.2(d). In determining whether to impose a fine, a sentencing court must consider the defendant's ability to pay a fine and the burden that the fine places on the defendant and his or her dependents. USSG § 5E1.2(d)(2), (3). In contrast, restitution is designed not to punish the defendant, but to compensate the victim. *United States v. Newman,* 659 F.3d 1235, 1241 (9th Cir. 2011) ("The purpose of restitution ... is not to punish the defendant, *but to make the victim whole again* by restoring to him or her the value of the losses suffered as a result of the defendant's crime.") (emphasis in original) (quoting *United States v. Hunter,* 618 F.3d 1062, 1064 (9th Cir.2010) (internal citations and quotation marks omitted)); *United States v. Webb,* 30 F.3d 687, 690 (6th Cir.1994) (The principle of restitution is "an integral part of virtually every formal system of criminal justice, of every culture and every time" holding that "whatever else the sanctioning power of society does to punish wrongdoers, it should also insure that the wrongdoer is required to the degree possible to restore the victim to his or her prior state of well-being.") (quoting legislative history of the Victim and Witness Protection Act, S. Rep. No. 97–532, at 30 (1982), reprinted at 1982 U.S.C.C.A.N. 2515, 2536). Unlike a fine, restitution is determined with reference to the loss suffered by the victim, and "[t]he court may not consider a defendant's financial status when calculating this amount." *United States v. McIntosh,* 198 F.3d 995, 1003 (7th Cir.2000); *see United States v. Agate,* 613 F.Supp.2d 315, 321 (E.D.N.Y.2009) (Restitution is generally required "without regard to the defendant's economic circumstances, though terms of payment may take into account the financial needs of the defendant and his or her family."). It is difficult to conceive circumstances when a defendant's inability to pay a fine would ever justify increasing his or her sentence. The court inevitably would be punishing the defendant wrongfully because of his or her poverty. A defendant's inability to pay restitution, however, could very well be aggravating factor that could justify increasing a defendant's sentence. In circumstances where a defendant has unlawfully taken a victim's money or property and cannot return it or pay it back, the Court would be punishing the defendant not because of his or her poverty, but because the defendant cannot mitigate the financial harm and loss that the defendant caused the victim to suffer.

lenient one had the Court not taken this factor into account.

Mr. Nathanson places great reliance on *United States v. Burgum*, 633 F.3d 810 (2011). His reliance on *Burgum*, however, is misplaced. While the Ninth Circuit panel majority held that this Court had increased Mr. Burgum's sentence because he was poor, the panel majority misconstrued the Court's reference to Mr. Burgum's inability to pay restitution. In that case, this Court imposed a 180–month sentence on Mr. Burgum after he pleaded guilty to two counts of armed bank robbery. *Burgum*, 633 F.3d at 811. Mr. Burgum carried out two robberies, one in Anaheim, California, and the other in Scottsdale, Arizona, in the same disturbing and malevolent manner. *Id.* In each instance, Mr. Burgum impersonated an FBI agent and was able to meet with a bank manager. *Id.* He then handcuffed a metal box to the manager's wrists and told the manager the box was a bomb he could detonate remotely. *Id.* He showed both managers a gun, and actually threatened to use it in the Scottsdale robbery. *Id.* at 811–12.

In sentencing Mr. Burgum, the Court was troubled by the serious and irreparable psychological harms Mr. Burgum caused the bank employees by fastening them to what was ostensibly a bomb and brandishing a firearm in their faces. The Court made a single, isolated reference regarding Mr. Burgum's inability to return the money that he stole from the victim banks in such a cruel and callous manner. Most importantly, the Court did not consider, and never would have considered, increasing Mr. Burgum's sentence because of his poverty. The record, read in context, demonstrates that this Court imposed

the sentence it did on Mr. Burgum because of the "very cruel and tormenting" nature of his crimes. *Id.* at 813. Judge O'Scannlain correctly noted in his dissent from the panel majority's decision that "it is abundantly clear" that this Court "departed [from the sentencing guidelines] because of the violent nature of the robberies, and that the judge's reference to unlikely restitution was an incidental observation that did not affect the sentence." *Id.* at 818 (O'Scannlain, J., dissenting). Simply put, Mr. Burgum's purported poverty had no impact on the sentence that the Court ultimately imposed.[9]

Similarly, in this case, the Court did not impose a heightened sentence on Mr. Nathanson because of his poverty. The Court imposed a significant prison sentence within the guideline range after taking into account the devastating harm that Mr. Nathanson cruelly inflicted on over 2,500 innocent people. Sadly, Mr. Nathanson's victims will never get their money back. The harm Mr. Nathanson inflicted on them is irreparable. The Court's consideration of this fact was not an "improper[ ] inject[ion] [of] socioeconomic status into the sentencing calculus," *Burgum*, 633 F.3d at 816, but a necessary prerequisite to achieving a fair and just sentence, *Rangel*, 697 F.3d at 804.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Mr. Nathanson contends that his sentence was imposed in violation of the Sixth Amendment because his attorneys' failure to object to the Court's consideration of his inability to pay restitution amounted to ineffective assistance of counsel. While Mr. Nathanson did not, and

---

**9.** Even though Mr. Burgum's inability to return the money he stole from the victim banks did not impact the sentence that the Court imposed, it still was an aggravating factor

that the Court needed to consider when analyzing the full nature and circumstances of Mr. Burgum's despicable crime under 18 U.S.C. § 3553.

likely could not, waive any ineffective assistance of counsel claim in his plea agreement, it fails nonetheless. In order to prove a claim for ineffective assistance of counsel, a defendant must show (1) that counsel's performance was so deficient that "counsel was not 'a reasonably competent attorney' and the advice was 'not within the range of competence demanded of attorneys in criminal cases'" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In order to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Here, defense counsel did not exhibit deficient performance when they failed to object to the Court's comment that Mr. Nathanson's victims would not receive their money back. Because this consideration was proper, no objection was appropriate. *See Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir.1985) ("Failure to raise a meritless argument does not constitute ineffective assistance."). Even if counsel had objected, Mr. Nathanson's sentence would have been the same. The Court still would have considered the nature and circumstances of the crime and its impact on the victims serious enough to warrant the 324–month sentence it ultimately imposed.

## C. LEADERSHIP ROLE ENHANCEMENT

■ Finally, Mr. Nathanson argues that his sentence violates the laws of the United States because there was no evidence in the record to support the leadership enhancement imposed by the Court under § 3B1.1(a) of the Sentencing Guidelines, which allows for a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Mr. Nathanson contends that there is no evidence in the record to support the conclusion that he organized, led, managed, or supervised one or more other criminal participants as is required to apply the enhancement. *See* United States Sentencing Commission, *Guidelines Manual*, § 3B1.1, comment. (n.2) (Nov. 2008). Like his restitution claim, this claim is barred because it does not fall into any of the limited exceptions to his waiver of his right to bring a collateral attack to his sentence. The Court's application of § 3B1.1(a) is also unreviewable through a § 2255 petition because the Ninth Circuit has already considered and rejected Mr. Nathanson's argument concerning the applicability of the enhancement. On appeal, Mr. Nathanson made the same argument he makes here in his opening brief, in his reply brief, and in his petition for rehearing and suggestion for rehearing en banc. In upholding his sentence, the Ninth Circuit held:

> The district court properly applied a four-level enhancement to Nathanson's sentence premised on his leadership role in the scheme to defraud. Nathanson's plea agreement establishes that Nathanson served as the chief executive officer of the companies involved in the scheme to defraud and was responsible for the operation and management of the Nathanson Investment Trust and its accounts; directly communicated to investors fraudulent information concerning their investments; and organized the scheme to defraud with a criminally culpable business partner.

(Gov.'s Exhs. Exh. E.) Mr. Nathanson's leadership enhancement claim is accord-

ingly unsuitable for rehearing through this petition. Furthermore, a § 2255 collateral attack to an error of law is not cognizable "unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Addonizio,* 442 U.S. at 185, 99 S.Ct. 2235 (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)). The sentence imposed on Mr. Nathanson is far below the 120–year statutory maximum and cannot be considered a complete miscarriage of justice by any measure. *See, e.g., Sun Bear v. United States,* 644 F.3d 700, 704 (8th Cir.2011) (no miscarriage of justice where sentence imposed was well within statutory maximum and same sentence could be reimposed if § 2255 relief was granted).

█ In any event, the Ninth Circuit correctly determined that the evidence in the record supported the application of the four-level leadership enhancement under § 3B1.1 of the Sentencing Guidelines. First, Mr. Nathanson organized at least one other criminal participant, his "50/50 business partner" Mr. Rish. (Plea Agreement ¶ 9(a).) More specifically, Mr. Nathanson admitted as part of his plea agreement that he caused lulling letters to be mailed to investors and that Mr. Rish aided in the drafting of those letters. (*Id.* ¶ 9(d).) Mr. Nathanson admits that unlike the employees of his various enterprises, Mr. Rish was also criminally culpable. (*See, e.g., id.* ¶ 9(b).) *See United States v. Carrero–Hernandez,* 643 F.3d 344, 352 (1st Cir.2011) (where much of the evidence suggested that participants were partners, enhancement was still appropriate because defendant "exercised at least some degree of leadership or organizational control" over other participants). Second, Mr. Nathanson directed a scheme that was "otherwise extensive." As the Court noted at the sentencing hearing, Mr. Nathanson orchestrated and directed an extensive scheme involving "numerous people and companies over many years with hundreds of victims losing millions of dollars." (Tr. 6:13–15.) Contrary to Mr. Nathanson's assertion, the evidence in the record was more than sufficient to apply the leadership enhancement. Consequently, the Court committed no legal error when it did so.

## V.  CONCLUSION

For the foregoing reasons, Mr. Nathanson's petition is **DENIED.**[10]

---

**10.** In the light of the panel majority's decision in *United States v. Burgum* arguably suggesting that a sentencing court cannot consider a defendant's inability to return the money or property that he or she has wrongfully taken from victims, the Court certifies the petition for appeal to the Ninth Circuit Court of Appeals.